732 F.2d 1523
 15 Fed. R. Evid. Serv. 1063
 Eleanor BUDOFF, Natural Mother of Kenneth Budoff, and Esther
Budoff and Kenneth Budoff, Individually and Esther
Budoff, Individually, Plaintiffs-Appellees,
v.
HOLIDAY INNS, INCORPORATED, Defendant-Appellant.
 No. 83-5115.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 15, 1984.
Decided May 2, 1984.
Rehearing and Rehearing En Banc Denied July 3, 1984.
 
 Kenneth R. Shuttleworth, Shuttleworth, Smith, Millar & Sabbatini, Memphis, Tenn., Leo Bearman, Jr. (argued) Memphis, Tenn., for defendant-appellant.
 James F. Schaeffer, Sr. (argued), James F. Schaeffer, Jr., Schaeffer & Schaeffer, Memphis, Tenn., for plaintiffs-appellees.
 Before MERRITT and JONES, Circuit Judges, and TAYLOR, District judge.*
 MERRITT, Circuit Judge.
 
 
 1
 On January 17, 1980, Norman Budoff was shot and killed by an assailant in a guest room he was occupying at a Holiday Inns motel located in Memphis, Tennessee. Mr. Budoff's children subsequently filed a wrongful death action against Holiday Inns, Inc., alleging that Mr. Budoff's death was proximately caused by Holiday Inns' failure to make adequate provisions for the safety of its guests. The jury returned a verdict in favor of the plaintiffs for $200,000. On appeal, Holiday Inns argues, inter alia, that the District Court should have ordered a new trial because of a conversation during the trial between an employee of plaintiffs' counsel and a relative of a juror, part of which was communicated to the juror. We agree.
 
 I.
 A.
 
 2
 The proof adduced at trial shows that Mr. Budoff was an employee of Holiday Inns who was temporarily living in a guest room at a Holiday Inns motel in Memphis until he found other suitable living arrangements. During the early evening of January 17, 1980, employees of the motel where Mr. Budoff was staying received a report of "a loud crash or a gunshot." Trial Transcript at 1098. Security guards were dispatched and moments later one of the guards discovered Mr. Budoff's body inside his room. He had been shot in the face; he apparently died instantly.
 
 
 3
 No one knows how the assailant gained entrance to the room, and the various theories advanced by the parties are a matter of inference and conjecture. A police officer who examined the room testified that there were no signs of forced entry. In the room was a clothes basket containing laundry detergents; clean clothing was folded on the bed; more of Mr. Budoff's laundry was found in the washing machine located down the hall: apparently Mr. Budoff was doing his laundry when the attack occurred. There was an unfinished letter on a table inside the room; the television set was turned on; the ashtray contained a cigarette which had burned to the end rather than being extinguished. The key to Mr. Budoff's room was found in his jacket which was on the couch inside the room. His body was lying near the bed, approximately twelve to fourteen feet from the door. There was no evidence of a struggle.
 
 
 4
 There was no eyewitness to the shooting. Shortly before the shooting, the security guards employed by Holiday Inns had patrolled the parking lot of the motel. The guards did not patrol the hallways. There was evidence that the door to Mr. Budoff's room was closed at 8:15 p.m. on the night of the shooting. The testimony of various witnesses established the time of the shooting between 8:15 and 8:40 p.m.
 
 
 5
 Plaintiffs rely most heavily on evidence that a master key or several master keys, each of which could be used to open the door to Mr. Budoff's room, had been misplaced or stolen. There was no evidence as to who, if anybody, possessed these lost or stolen keys. Plaintiffs' theory is that a master key was used by the assailant to enter Mr. Budoff's room. Plaintiffs point to the physical evidence in the room, especially the location of the body, as supporting the inference that Mr. Budoff was attacked by a person who entered the room without his consent. Plaintiffs also point to evidence that Mr. Budoff was not wearing a sweater at the time he was shot, and that the temperature that night was below fifty degrees, as supporting the inference that Mr. Budoff had not left his door open.
 
 
 6
 Holiday Inns' theory is that the circumstances surrounding the shooting were not established by sufficient proof to support the ultimate conclusion that Mr. Budoff's attacker gained entry to the room by using a master key. It is equally or more probable, Holiday Inns argues, that Mr. Budoff left his door open while using the laundry machines down the hall, or that he invited the assailant into the room not aware of the potential danger. Plaintiffs also argue, apart from the master key thesis, that Holiday Inns' negligent failure to maintain a more efficient security force at this motel, to warn guests of potential attackers, and to provide better perimeter control around the motel proximately caused Mr. Budoff's death. Holiday Inns responds that its security measures were reasonable and that this attack is simply the kind which could not be prevented, even with the exercise of due care. Holiday Inns' motion for a directed verdict based on these two arguments was denied and the case was submitted to the jury which returned a verdict in favor of the plaintiffs in the amount of $200,000.
 
 B.
 
 7
 During the trial an employee of plaintiffs' counsel, who is also the attorney's daughter, telephoned the son of one of the jurors and discussed the case. The employee apparently had a position equivalent to a paralegal: she served subpoenas, ran errands, and was present in the courtroom during the trial of this case. The employee had been friends with the juror's son for several years, although plaintiffs' counsel did not recollect this relationship and it was not uncovered during voir dire. The employee purposely discussed various aspects of the case with the juror's son, but she requested that he not disclose any details of the conversation to his father.
 
 
 8
 When plaintiffs' counsel became aware of this contact, he promptly brought the matter to the District Court's attention. At the court's suggestion the juror was questioned outside the presence of the other jurors and he stated that his son had told him about the conversation and that the trial might last for three or four weeks. When the juror heard this prediction he "got very low." Trial Transcript at 761. The juror stated that he did not think the contact would affect his consideration of the case. He was eventually selected foreman of the jury that returned the verdict in plaintiffs' favor.
 
 
 9
 The District Court denied defendant's motion for a mistrial, but gave defendant the opportunity to dismiss the juror since two alternates were available. Defendant's counsel chose not to dismiss the juror since defendant's counsel believed the juror would be elected foreman and his dismissal would upset the balance that defendant's counsel sought to achieve in selecting the jury, or that the juror's dismissal would alienate the rest of the jurors.
 
 
 10
 In this appeal, Holiday Inns argues that its motion for a directed verdict should be granted or, alternatively, that a new trial should be ordered because of the contact with the juror's son and certain other alleged errors. We reach only the argument concerning the contact with the juror.
 
 II.
 
 11
 Defendant does not contend that plaintiffs or plaintiffs' counsel motivated, encouraged or condoned this contact, or that it was anything other than an innocent act by an uninitiated employee. Accordingly, defendant does not seek any disciplinary action and none appears warranted. The sole issue is whether the District Court should have ordered a new trial because of the contact.
 
 
 12
 A motion for a new trial based on counsel or jury misconduct is directed to the discretion of the trial court and its decision will not be reversed except for abuse of discretion. Thomas v. Nuss, 353 F.2d 257, 259 (6th Cir.1965) and cases cited therein. Abuse of discretion normally will be found only when the substantial rights of the parties have been impaired. However, there is a class of cases where some irregularity so taints the trial that the appearance of impropriety compels a new trial as a prophylactic rather than remedial measure. As was stated long ago, the "fountains of justice must be kept pure and free from suspicion, or the citizen will lose all respect for the laws, and the rights of persons, and property will become insecure." Davidson v. Manlove, 42 Tenn. 346, 350 (1865). To avoid pollution of the waters of justice, "[s]uitors and jurors must not place themselves in a position where their conduct creates suspicion." Id. "The administration of justice should not only be chaste, but should not even be suspected." Sexton v. Lelievrre, 44 Tenn. 11, 14 (1867).
 
 
 13
 Applying these salutary principles to the case sub judice, we believe the District Court abused its discretion in denying defendant's motion for a new trial. Several factors compel this conclusion. Foremost is the fact that the contact in this case was deliberate and purposeful: the employee initiated the telephone conversation purposely to discuss the case with the juror's son. If the contact had occurred by "mere accident or inadvertance, without any improper design," then there could be no "just or reasonable grounds to disturb the verdict" unless it appeared that the contact had an improper influence upon the juror. Sexton v. Lelievrre, 44 Tenn. at 13-14; see also Palmer v. Miller, 60 F.Supp. 710 (W.D.Mo.1945); O'Berry v. Perry, 266 N.C. 77, 145 S.E.2d 321 (1965); Murphy v. Virginia Carolina Freight Lines, Inc., 215 Va. 770, 213 S.E.2d 769 (Va.1975). Here the contact was not the product of accident or mistake but of the purposeful actions of an important employee of plaintiffs' counsel. When contact is initiated by counsel or an immediate subordinate of counsel, and the contact is initiated for the purpose of discussing the case, the issue is not whether "the juror has in some way been tainted by gaining knowledge of the case outside the courtroom," Brief of Appellee at 39; rather, the issue is whether the evenhandedness of the federal scales of justice has been called into question by the public's knowledge of private conversations between persons under the supervision of counsel and persons close to jurors.
 
 
 14
 In such cases, the court should not indulge any presumption that the contact was harmless; indeed, the presumption should be the opposite.[1] If the court is not satisfied by clear and convincing evidence that the contact was utterly harmless, a new trial should be ordered.[2] The cost of this rule may be significant in those few cases that require its application, but our responsibility to protect jealously and zealously the institutional integrity of the federal courts requires this occasional expenditure of time and resources.
 
 
 15
 That a new trial should be ordered when contact with a juror is purposely made by counsel or his employee is a strong principle, but not an absolute rule. Cases might appear where the harmlessness of the contact, even if made purposely, is beyond cavil. For instance, in this case the contact was between an employee of plaintiffs' counsel and a relative of the juror: it is twice removed from the more suspect contact between counsel and a juror and three times removed from the most suspect contact, namely, that between a party and a juror. See, e.g., Sexton v. Lelievrre, 44 Tenn. at 13 (verdict returned for party who attempts to influence juror will be set aside as punishment) (dictum). Also militating against a new trial is the fact that the juror did not learn all of the contents of the conversation; that he stated he would not be prejudiced; and that defendant had the opportunity to remove the juror and replace him with an alternate.
 
 
 16
 There are other factors in this case, however, that suggest the need for a new trial. Most significant, in our view, is the closeness of the proof on the issue of proximate causation. In a companion case, Kveragas v. Scottish Inns, Inc., 733 F.2d 409, (6th Cir.1984), this Court addressed the standard of care that applies in cases such as the instant one. In Kveragas the Court determined that Zang v. Leonard, 643 S.W.2d 657 (Tenn.App.1982), rather than Cornpropst v. Sloan, 528 S.W.2d 188 (Tenn.1975), controls. We would be required to review the denial of defendant's motion for a directed verdict under that standard. Kveragas establishes clearly that plaintiffs bear the burden of persuasion on the issue of proximate causation, and we view the question of proximate causation in this case as exceedingly close. The presumption that the contact swayed the juror--who went on to be elected foreman of the jury--on this close question of fact is not rebutted by his testimony that it did not; the human mind is too complex for us fully to understand and explain our actions, even to ourselves. External and verifiable indicia of harmlessness are necessary to rebut this presumption. On balance we believe the ends of justice are best satisfied by retrial of the case free from any outside contact that may have subtly influenced a juror's view of the case.
 
 
 17
 Accordingly, the judgment of the District Court is vacated and the case is remanded for a new trial.
 
 
 
 *
 The Honorable Anna Diggs Taylor, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The Tennessee Supreme Court recently stated that if it is shown that "as a result of a juror's contact with a third person some extraneous prejudicial information, fact or opinion, was imported to one or more jurors or some outside improper influence was brought to bear on one or more jurors," the prosecution in a criminal case has the burden of proving no prejudice. State v. Blackwell, 664 S.W.2d 686, 689 (Tenn.1984)
 
 
 [2]
 See Palmer v. Miller, 60 F.Supp. 710, 716 (W.D.Mo.1945), wherein the court adopted the following rule announced by the Supreme Court of Missouri in Kennedy v. Holladay, 105 Mo. 24, 16 S.W. 688, 691 (1891):
 The courts look with suspicion upon any communications between parties to a suit and a jury impaneled to try it; and if such communication is had, and it appears the parties talked about the suit or the communication is not explained satisfactorily, it will, in itself, be ground for new trial. If, when explained, however, it can be seen that in the communication nothing was said about the case, and nothing said or done for the purpose of influencing the mind of the juror, and the court cannot see from what was said or done, or from the verdict rendered by the jury that such communication had any influence in directing the verdict, it will not be set aside on account thereof.
 We believe the federal rule, like the Montana rule discussed in Palmer, should distinguish instances of purposeful contact from other kinds of contact; purposeful contact creates an appearance of unfairness so overwhelming that harm--not to the parties but to the integrity of the federal judicial system--virtually always results.