Albert McCULLOUGH, Plaintiff,

v.

Richard CADY, et al., Defendants.

Civ. No. 82-74264.

United States District Court,
E.D. Michigan, S.D.

July 30, 1986.

Hugh M. Davis, Jr., Detroit, Mich., Douglas M. Mullkoff, Ann Arbor, Mich., for plaintiff.

Elaine Dierwa Fischoff, Corrections Div., Detroit, Mich., for defendants.

### MEMORANDUM OPINION AND ORDER

PHILIP PRATT, Chief Judge.

This is an action brought under 42 U.S.C. § 1983 arising from a shooting incident at the State Prison for Southern Michigan at Jackson, Michigan, the plaintiff alleging that he was deprived of rights guaranteed by the Eighth and Fourteenth Amend-

ments. On January 31, 1986, the jury returned a verdict for the plaintiff, assessing actual damages in the amount of $60,000 but denying the plaintiff any punitive damages. The defendants now move for a Judgment Notwithstanding the Verdict, or in the alternative, for a new trial.

A motion for a judgment notwithstanding the verdict is brought pursuant to Fed. R.Civ.P. 56(b). This motion cannot be made unless the defendant had previously moved for a directed verdict either at the close of plaintiff's proofs, or before the case had gone to the jury. *Mattivi v. South African Marine Corp.*, 618 F.2d 163 (2d Cir.1980); *see* Wright & Miller, *Federal Practice & Procedure:* Civil § 2537, n. 31. The defendant did not file a motion for directed verdict in this case, and therefore the court cannot entertain his motion for judgment notwithstanding the verdict.[1]

A motion for new trial brought pursuant to Fed.R.Civ.P. 59 is committed to the discretion of the trial court, whose decision will not be reversed absent a finding of an abuse of that discretion. *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980); *Budoff v. Holiday Inns, Inc.*, 732 F.2d 1523 (6th Cir. 1984). A new trial may be granted if the movant demonstrates that the verdict was based upon manifest errors of law or fact. *Morvay v. Maghielse Tool and Die Co.*, 708 F.2d 229, 233 (6th Cir.1983), *cert. denied*, 464 U.S. 1011, 104 S.Ct. 534, 78 L.Ed.2d 715 (1983). The defendant claims that this court committed two prejudicial errors of law. For the following reasons, the court rejects these contentions and denies the defendant's motion for new trial.

The court will first review the facts. On July 12, 1982, defendant Richard Cady, a prison guard, intentionally shot plaintiff Albert McCullough, an inmate at Jackson Prison. On that day, a fight had broken out in the North Yard of Jackson involving three or four inmates. The plaintiff was not involved in this fight. Several prison guards attempted to break up the fight, and the ensuing struggle attracted the attention of possibly 200 prisoners who gathered around the combatants, urging the guards to leave the fighting inmates alone. A few warning shots were fired, after which the defendant fired the shot which struck the plaintiff in the knee.[2]

Not a single witness was able to place the plaintiff closer than twenty to thirty feet from the fight. There was no testimony that he ever joined the crowd of prisoners around the fight. All the witnesses save one testified that the plaintiff was simply standing some distance from the fight, watching.[3] The sole exception to this version of the facts is to be found in the testimony of the defendant. He said, both in deposition testimony and at trial, that he observed the plaintiff chasing, striking, and attacking another inmate. None of the other witnesses, including inmates and prison guards, corroborated this testimony. The person who was allegedly attacked was never identified or produced. No inmate ever filed a complaint against the plaintiff. The defendant testified that an incident report which bore his signature and conformed to his version of the facts had in fact not been filed by him and that his signature had been forged.

One of the officers involved in the fight, Sgt. Cotton, testified that in the course of attempting to subdue the struggling prisoners he put in a call for "firepower." The defendant said that he understood this to

---

**1.** It should be noted that while the defendant did file several motions for summary judgment early in the trial, the court does not consider these to be equivalent to a motion for directed verdict. The denial of this motion on technical grounds has little substantive impact, as it will become clear from the court's disposition of the defendant's motion for new trial that the motion for judgment notwithstanding the verdict would also have been denied on the merits.

**2.** Many of the facts in this case were stipulated to, including the facts that the defendant intentionally shot the plaintiff and that the plaintiff was not involved in the fight.

**3.** Four inmates who were standing near the plaintiff when he was shot testified, as well as six prison guards who were present on the north yard when the fight broke out. None of these witnesses saw the plaintiff engaged in any aggressive conduct.

mean he was to shoot to disable, as he had already fired a warning shot. Sgt. Cotton said that he was only asking for a warning shot, and that it would have been inappropriate for someone to have intentionally fired at a prisoner in that situation. Though he did believe that he was in danger while breaking up the fight, Cotton did not think the situation warranted either the use of deadly force or even tear gas. Apart from the bullet wound to the plaintiff, one guard was struck in the mouth while breaking up the fight on the yard and no inmates reported injuries. Upon hearing the request for firepower, the defendant testified that he intentionally shot the plaintiff because he appeared to be the most aggressive inmate he had a clear shot at. He stated that his motive was to protect the officers in the North Yard and to bring order to the facility.

Jackson is the largest walled correctional facility in the United States. This shooting was the first which had occurred at Jackson in the memory of any of the witnesses, who included both the Warden and the Director of the Michigan Department of Corrections. The uncontradicted testimony indicated that the tension level in the North Yard increased after the shooting of the plaintiff. The highest ranking individual at the prison at the time of the incident, Deputy Warden Withrow, testified that a fight in the yard is not a disturbance, but that what happened after the shooting was a disturbance.

The defendant argues that based upon a Supreme Court decision that was issued after the jury verdict in this case, this court erred in allowing the case to go to the jury.[4] The Supreme Court has recently set forth what standards should be applied by the trial court in deciding a motion for directed verdict made in a case involving Eighth Amendment claims of cruel and unusual punishment arising out of a prison disturbance. *Whitley v. Albers*, —— U.S. ——, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).

In *Whitley*, a guard was taken hostage by some inmates at a state prison. During negotiations with prison officials, the ringleader of this uprising, who was armed with a knife, threatened to kill the hostage. He also said that one inmate had been killed and that other deaths would follow.[5] After a period of negotiations, it was decided that an assault was necessary to protect the lives of the hostage and the non-rioting inmates. During the course of the assault, a non-rioting inmate was shot in the leg as he attempted to aid elderly inmates.

The injured inmate filed suit, alleging violations of both his Eighth and Fourteenth Amendment rights. The trial court directed a verdict for the defendants at the close of the evidence, ruling that the defendants' action were reasonably necessary to protect life and to restore order and discipline. *Albers v. Whitley*, 546 F.Supp. 726 (D.C.Ore.1982). The Ninth Circuit reversed, holding that an Eighth Amendment violation claim may go to the jury if the jury could conclude that the defendants knew or should have known their plan was unnecessary, or if it was conduct which was carried out with plain deliberate indifference to the plaintiff's right to be free of cruel and unusual punishment. *Albers v. Whitley*, 743 F.2d 1372 (9th Cir.1984). On March 4, 1986, the Supreme Court reversed.

*Whitley* held that if the evidence will only support a inference of errors of judgment by the defendants, an Eighth Amendment claim should not go to the jury.

> Accordingly, in ruling on a motion for a directed verdict in a case such as this, courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives. Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the

---

4. The court notes once again that the defendant never gave it an opportunity to keep this case from the jury by failing to move for a directed verdict.

5. It turned out that no inmates had been killed, though one had been beaten.

infliction of pain under the standard we have described, the case should not go to the jury.

*Whitley,* 106 S.Ct. at 1085–1086. The court said that prison administrators should be "accorded wide-ranging deference" by courts and juries who are reviewing actions taken to restore order in the face of a prison disturbance. In considering whether a case should go to the jury, the court must view the prison administrators' actions in light of the exigencies of the tense prison environment.

> Where a prison security measure is undertaken to resolve a disturbance, such as occurred in this case, that indisputably poses significant risks to the safety to inmates and prison staff, we think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' *Johnson v. Glick,* 481 F.2d 1028, 1033 (CA2) (Friedly, J.) cert. denied *sub nom, John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). As the District Judge correctly perceived, "such factors as the need for the application of force, the relationship between the need and the amount of force that was used [and] the extent of injury inflicted," *ibid.,* are relevant to that ultimate determination. From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.

*Id.,* 106 S.Ct. at 1805. Relevant factors include:

> The extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response.

*Id.* Of course, this deference to prison officials is not unlimited.

> It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice.

*Id.,* 106 S.Ct. at 1805.

Reviewing the facts before it, the Supreme Court found that at most the evidence established that the prison officials arguably erred in judgment when they decided to employ potentially deadly force. The respondent (plaintiff) conceded that lives were in danger and that at least one inmate was armed and dangerous. At the time he was shot, the respondent was running up a set of stairs after the assault team. The court found plausible the appellant's contention that it was reasonable for them to believe that the respondent might be intervening in support of the rebelling inmates. The court concluded that the evidence only established that the appellant's plan was not perfect, and would not allow a reasonable inference that an Eighth Amendment violation had occurred.

> Conceivably, Whitley could have added a proviso exempting respondent from his order to shoot any prisoner climbing the stairs. But such an oversight simply does not rise to the level of an Eighth Amendment violation. Officials cannot realistically be expected to consider every contingency or minimize every risk, and it was far from inevitable that respondent would react as he did. Whitley was about to risk his life in an effort to rescue the hostage, and he was understandably focusing on the orders essential to the success of the plan. His failure to make special provision for respondent may have been unfortunate, but is hardly behavior from which a wanton willingness to inflict unjustified suffering on respondent can be inferred.

*Id.,* 106 S.Ct. at 1087.

Once the court established that the assault plan, which included orders to "shoot low" at anyone climbing the stairs on

which the respondent was shot was reasonable, it held that the burden of establishing that the actual shooting was a wanton and unnecessary infliction of pain was an "extremely heavy one." *Id.* The court said there was no indication that the officer who fired the shot acted vindictively.

This does not establish that Kennicott shot respondent knowing it was unnecessary to do so. Kennicott had some basis for believing that respondent constituted a threat to the hostage and to Whitley, and had at most a few seconds in which to react. He was also under orders to respond to such a perceived threat in precisely the manner he did. Under these circumstances, the actual shooting was part and parcel of a good faith effort to restore prison security.

*Id.*, 106 S.Ct. at 1087.

Returning to the case *sub judice*, the court must determine whether there was sufficient evidence for the jury to reasonably infer that the defendant deliberately and wantonly inflicted pain upon the plaintiff in violation of his Eighth Amendment rights. If the court finds that the defendant's conduct reflected a mere error of judgment, then it was prejudicial error to allow this case to go to the jury. Reviewing the evidence in light most favorable to the plaintiff, the court finds that no error was committed in allowing the jury to decide this case.

*Whitley* involved a shooting arising out of a planned assault on armed rebellious inmates who were threatening the life of a prison guard held hostage, and who refused to capitulate during negotiations. The undisputed testimony was that the inmate was shot while running up some stairs after the assault team. In this case, there were no hostages, nor was there an uprising of inmates who took control of a cell block. The shooting followed a fistfight between three or four inmates, a common occurrence at Jackson. This was the first time an inmate had been shot at Jackson in anyone's experience.[6] The evidence showed that to the extent there was a serious disturbance at all, it was in response to the shooting. Apart from the defendant's testimony, no one, including the officers who were attempting to stop the fight, placed the plaintiff close to the disturbance. The defendant's testimony excepted, the evidence showed that the plaintiff was simply standing some distance from the fight, and was not acting in an aggressive manner toward anyone.

In *Whitley*, the plaintiff's argument was that the prison administrator's conduct was unconstitutional because they failed to minimize the risk of harm to non-rioting inmates. Even the plaintiff's experts were only able to testify that the defendants gave "inadequate consideration" to less forceful means of intervention, and that they were "possibly a little hasty in using the firepower." *Whitley*, 106 S.Ct. at 1086. There was no such equivocal evidence in this case. Even the officers who were in the midst of the struggle testified that intentionally shooting any inmate in that situation was inappropriate, and that the fight had not even risen to a level where tear gas was necessary. There was no testimony that the shooting was even arguably justifiable.[7]

The shooting in *Whitley* was part and parcel of a carefully considered plan by prison administrators faced by rebellious and dangerous inmates with whom negotiations were making little progress. Here, the defendant's conduct was not engaged in pursuant to a plan. It was not a "last resort" decision made after all other means of restoring order had failed. While a

---

6. In his brief, the defendant argues he was concerned that the fight might develop into a full-fledged riot, which had in fact occurred only a year before. However, no inmates were shot during this earlier incident, which appears to have been quite serious.

7. The defendant did receive a commendation for his conduct. However, when the Warden testified from the stand, his support of the plaintiff had definitely waned, and he said his conclusion would differ if the defendants' testimony about the plaintiff chasing and beating another inmate was not what in fact had happened.

"firepower" order was given, no prison official other than the defendant understood that to mean the intentional shooting of an inmate was being called for. Even if this was a reasonable interpretation of that order, it was only the defendant's testimony that in any way justified selecting the plaintiff as the inmate to be shot.

■ In sum, the evidence in this case was more than sufficient to permit a reasonable inference by the jury that the defendant deliberately inflicted unnecessary pain on the plaintiff in violation of his Eighth Amendment rights. The only evidence that would suggest that this was a mere dispute over the reasonableness of a particular use of force came from the mouth of the defendant. While this court is mindful of the Supreme Court's admonition that courts and juries should defer to prison administrators as to matters of internal discipline, and not apply hindsight in judging their conduct, it is equally clear that actions taken with no legitimate purpose are not insulated from review. This court cannot take a case away from the jury solely on the basis of the defendant's contention that his conduct was reasonable when his testimony was not corroborated by the testimony of either his fellow prison officials or the inmates who witnessed the incident.

The court also notes that the jury instructions given in this case parallel the guidelines set forth by the Supreme Court in *Whitley*. The jury was instructed that "punishment is characterized as cruel and unusual when it involves an unnecessary and wanton infliction of pain or is grossly disproportionate to the severity of the offense." They were also instructed that "an officer is entitled to use such force as a reasonable person would think is required to protect a prisoner within the prison setting." The court ordered the jury to apply a "balancing" test, using language drawn directly from *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973), which was cited with approval in *Whitley*. "The jury must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether the amount of force that was applied was reasonable in the light of all the circumstances." Thus not only was there sufficient evidence to go to the jury in this case but the jury was also instructed that prison officials are entitled to use force and that the jury must consider the circumstances confronting the defendant in determining whether his conduct was unconstitutional.

■ The defendants' other assignment of error is that this court should have applied the doctrine of qualified immunity to these facts and dismissed him from the case. The rule of qualified immunity is that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). This is a purely legal inquiry, to be determined by the court, and it is error to allow the jury to decide this issue. *Donta v. Hooper*, 774 F.2d 716, 719 (6th Cir.1985). The standard is an objective one, eliminating from consideration inquiry about the defendant's subjective state of mind, such as bad faith or malice. *Harlow*, 457 U.S. at 816–818, 102 S.Ct. at 2737–2738; *Floyd v. Farrell*, 765 F.2d 1 (1st Cir.1985). The defendant in this case is not immune if, on an objective basis, it is obvious that no reasonably competent prison guard would have intentionally shot the plaintiff in these circumstances. *Malley v. Briggs*, —— U.S. ——, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

■ The Eighth Amendment expressly provides that "cruel and unusual punishments" shall not be inflicted. The caselaw interpreting this statute is clear that while mere lack of due care does not violate Eighth Amendment rights, *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the infliction of unnecessary pain does constitute cruel and unusual pun-

ishment. *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1976). On a local level, the Michigan Department of Corrections has promulgated an explicit directive governing the use of deadly force:

> Deadly force is force which is likely to result in death or serious injury. Knives and firearms are always considered instruments of deadly force. Deadly force should only be used as a last resort where all other means to secure the prisoner would be fruitless or dangerous, and only to prevent death or serious physical injury, or where necessary to prevent the escape of a prisoner from a walled or fenced institution.

Department of Correction Policy Directive, PD–DWA–32.02. It is beyond dispute that the plaintiff had a clearly established constitutional right not to have intentional pain unnecessarily inflicted upon him, and that the use of deadly force in this case was in direct violation of a prison regulation. The overwhelming weight of the evidence is that the defendant intentionally shot an inmate who did not pose a threat to the safety of anyone. This court cannot rely upon the uncorroborated testimony of the defendant to establish qualified immunity. Further, his subjective intentions which he advances as justification for his conduct are irrelevant, as this is an objective inquiry.

The defendant advances the interesting argument that there was no clearly established law prior to *Whitley* on the issue of what standards govern the conduct of prison guards during disturbances. This position is flawed in two respects. First, both the Eighth Amendment and the prison regulations clearly gave notice to the defendant that the infliction of unnecessary pain was prohibited. For this to be a clearly established right does not require that there be existing caselaw with facts identical to the ones at bar in which a court set for standards of review. This would essentially give defendants one "free shot" at an individual's constitutional rights because rarely does one find precedent which is on "all fours" with the case being litigated. The shield of qualified immunity would be-

come the permanent bar of absolute immunity if a state official could only be found liable if some other court had previously found liability on almost identical facts.

The second reason the defendant's argument falls is because even if his construction of the qualified immunity doctrine was correct, it would not help him in this particular case. To the extent *Whitley* changes Eighth Amendment law, it has changed it in favor of the defense. After *Whitley*, plaintiffs face major hurdles before their Eighth Amendment claims can go to the jury. Given that this court has already found that the plaintiffs met this heightened burden, the defendant cannot argue that this change in the law would justify a retroactive grant of qualified immunity.

The plaintiff has filed a petition for attorney fees and costs to be assessed against the defendant pursuant to 42 U.S.C. § 1988, which states in pertinent part:

> In any action or proceeding to enforce a provision of sections 1977, 1978, 1979, 1980 and 1981 of the Revised Statutes [42 U.S.C. §§ 1981–1983, 1985, 1986] ..., the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

Counsel for the plaintiff, Hugh M. Davis and Douglas Mullkoff, have submitted affidavits in support of this petition, detailing the hours expended in the prosecution of this case, and setting forth their qualifications justifying the hourly rates which they charge. Counsel claim a total of 485.15 hours, and a basic fee award of $54,210.00. They request that this fee be enhanced by a multiplier of 2.0, resulting in a total attorney fee request of $108,420.00. The requested costs total $4,812.77, with post-judgment interest to be applied to the entire award of fees and costs. The defendant contests the hourly rates charged by plaintiff's counsel, the appropriateness of using a "multiplier" in this case, and some details of the fee and cost request.

There is no dispute that the plaintiff is a prevailing party and is entitled to recover

fees and costs, thus the court has only to determine the amounts. In addressing the reasonableness of this fee request, the court is mindful of the Supreme Court's admonition that a "request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). As one justice has noted, disputes over fee awards "must be the least socially productive types of litigation imaginable," and that "paragraph-by-paragraph scrutiny of the explanation for specific exercise of the district court's broad discretion under § 1988 serves no productive purpose, [and] vindicates no one's civil rights." *Hensley*, 461 U.S. at 442, 454–455, 103 S.Ct. at 1944, 1950 (Brennan, J., concurring in part and dissenting in part). The determination is within the sound discretion of the trial court, and appellate review is very restricted. *Id.*, 461 U.S. at 437, 103 S.Ct. at 1941; *Anderson v. City of Bessemer*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

▮▮▮ 42 U.S.C. § 1988 provides for a "reasonable" fee. The Supreme Court has said that:

The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services.

*Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939. The fair market value for the attorney's services is the standard for a reasonable hourly rate. *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Louisville Black Police Officers Organization v. City of Louisville*, 700 F.2d 268 (6th Cir.1983); *Northcross v. Board of Education of Memphis City Schools*, 611 F.2d 624 (6th Cir.1979) *cert. denied* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980). Other factors that provide guidance to a district court in calculating a reasonable rate include:

— time and labor involved
— novelty and difficulty of legal and factual questions
— skill requisite to properly perform the legal service
— preclusion of other employment due to acceptance of the case
— customary fee
— whether fee is fixed or contingent
— time limitations imposed by the client of the circumstances
— amounts involved and the result obtained
— experience, reputation, and ability of the attorneys
— "undesirability" of the case
— nature and length of the professional relationship with the client
— awards in similar cases

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974). The relevance of these factors has been endorsed by Congress, S.Rep. No. 94–1011, 94th Cong., 2d Sess. 8 (1976), *reprinted in* 5 U.S.Code Cong. & Ad.News 5908, 5913 (1976), and by the Supreme Court. *City of Riverside v. Santos Rivera*, —— U.S. ——, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986); *Hensley*, 461 U.S. 424, 434 n. 9, 103 S.Ct. 1933, 1940 n. 9; *Blum v. Stenson*, 465 U.S. 886, 893–895, 104 S.Ct. 1541, 1546–1547.[8]

▮▮▮ The defendant argues that the fee request is unreasonably high in comparison to the $60,000 jury award and also in light of the contingent fee agreement between the plaintiff and his counsel, which would have netted counsel only $20,000 in fees. The Supreme Court has recently rejected the proposition that fee awards under § 1988 should necessarily be proportionate to the amount of damages a plaintiff actually recovers. *City of Riverside v. Santos Rivera*, —— U.S. ——, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986). *Rivera* affirmed a fee award of $245,456.25 in a case where the

---

**8.** The Sixth Circuit is sceptical about the value of the *"Johnson"* factors in determining a reasonable hourly rate, *Northcross*, 611 F.2d at 642–643. However, the recent endorsement of these factors by the Supreme Court indicates that they are still relevant.

plaintiff recovered only $13,300 for their federal claims and $20,050 for their state law claims. The plurality opinion, emphasizing the importance of civil rights plaintiffs acting as private attorneys general enforcing constitutional rights for the benefit of the public as well as the litigants, held that the amount of money damages should only be treated as one of many factors that the trial court must consider in calculating the fee award. *Id.*, 106 S.Ct. at 2694. Justice Powell, concurring in the judgment, wrote that "neither the decisions of this Court nor the legislative history of § 1988 support" the proposition that fees should be proportional with damages recovered in a civil rights case. *Id.*, at 2700, (Powell, J., concurring.) [9] Justice Rehnquist, joined by three other justices, wrote in dissent that "the importation of the contigent-fee model to govern fee awards under § 1988 is not warranted by the terms and legislative history of the statute." *Id.*, at 2705, (Rehnquist, J. dissenting).[10] Thus the defendant's argument that the fee petition is *per se* unreasonable because it allows plaintiff's counsel to recover more than would have been allowed under the contingent fee agreement, or because the fees approach or surpass the damage award, must be rejected. The court will, of course, take the results obtained in this lawsuit into account as an important factor in determining a reasonable rate.

■ Mr. Davis seeks an hourly rate of $150.00 for office time, $200.00 an hour for out-of-office time, and $2,000 for a full day in court. He is a 1969 graduate of Harvard Law School, who served as a staff attorney in various public interest organizations until 1972, primarily as a plaintiffs' civil rights litigator. Since 1972, he has been in private practice, spending the last three years as a solo practitioner. He has prosecuted over 100 civil rights cases to conclusion, has served on the National Executive Board of the National Lawyers Guild and the Executive Board of the Michigan Trial Lawyers Association, as well as having participated as a speaker in numerous trial practice seminars.

Mr. Mullkoff seeks an hourly rate of $100 for all of his time. He is a 1981 graduate of the Detroit College of Law. He served as a staff attorney for the State Appellate Defender's Office of Michigan from 1981 to 1982, providing appellate criminal representation to indigents. The next year he worked with Mr. Davis, and since 1983 has worked as a solo practitioner, his areas of practice being civil rights litigation and criminal defense.

In 1984, the State Bar of Michigan conducted an informal wage survey of its membership. 64 *Mich Bar J.* 1186 and 1306 (1985); 65 *Mich Bar J.* 27 (1986). Courts of this district have relied in some measure on past surveys in setting fees in civil rights litigation. *NAACP v. Detroit Police Officers Assoc.*, 620 F.Supp. 1173 (E.D.Mich.1985) ["DPOA"]; *Davis v. Chrysler Corp.*, Slip Op. No. 78–71233 (E.D.Mich. May 26, 1983). For attorneys with 15 to 19 years of practice, such as Mr. Davis, the hourly rates range from $75 to $125 per hour. For those with 5 to 9 years of practice, such as Mr. Mullkoff, the range is from $65 to $100 per hour. The median hourly rate for downtown Detroit practitioners is $75 per hour, while that for solo practitioners ranges from $60 to $100 per hour.

Reviewing some of the *"Johnson"* factors, the time and labor consumed by this case was substantial. However, it could not be said that this case presented either legal or factual issues of unusual difficulty. The defense stipulated to the fact that this was an intentional shooting, and the outcome of the case hinged upon

---

9. Justice Powell did write that the degree of success obtained is the "most critical factor," citing *Hensley,* 461 U.S. at 436, 103 S.Ct. at 1941. *Id.*

10. The dissent would require a stronger linkage between the damage award and attorney fees, except in those cases where the constitutional rights involved are nonpecuniary in nature, the litigation is unnecessarily prolonged by bad-faith conduct of the defendants, or if the litigation produces significant, identifiable benefits for persons other than the plaintiffs. *Id.*

whether the jury would believe the uncorroborated testimony of the defendant or that of the numerous witnesses called by the plaintiff. The plaintiff did prevail in this case, but as the damage award indicates, large sums were not at stake here, nor was this a class action type civil rights suit where significant equitable remedies are often part of the outcome. There is no evidence that the acceptance of this case precluded other employment by counsel.[11] Finally, given that both of the lawyers do much of their work in civil rights litigation, it cannot be said that this was an "undesirable" case.

Reviewing the rates customarily charged in southeastern Michigan, along with the factors relating to the difficulty of the case, this court concludes that the rates sought by counsel are excessive. For instance, Mr. Davis' out-of-office rate is almost twice that normally charged in this area, and his rate for court time is even higher. This is not to say that this court is bound by the results of the survey. For instance, in *NAACP v. Detroit Police Officers Assoc.*, 620 F.Supp. 1173 (E.D.Mich. 1985) ["DPOA"], the court awarded the lead attorney for the plaintiffs a rate of $200.00 per hour. However, that individual brought extraordinary qualifications to the litigation. He had been in charge of all school desegregation litigation in the United States for the NAACP for several years, and was general counsel to the national NAACP for four years. The *DPOA* case was a class action employment discrimination case of exceptional factual and legal difficulty, with results which will have a lasting impact on the structure of the police department in the city of Detroit and several hundred individuals.[12] The court in *DPOA* estimated the dollar value of the plaintiffs' success as at least twenty-eight million dollars. While Mr. Davis is an excellent lawyer, and did a fine job in this case, he did not bring with him the qualifications of the lead counsel in *DPOA*, nor did this suit even approach that action in magnitude of either difficulty or remedy.

The court emphasizes that it does not reduce counsels' request lightly. It is clear that the purpose of § 1988 is to ensure "effective access to the judicial process for persons with civil rights grievances." *Hensley*, 461 U.S. at 429, 103 S.Ct. at 1937. However, the Supreme Court has also held that "a reasonable attorney's fee is one that is adequate to attract competent counsel, but ... [that does] not produce windfalls to attorneys." *Blum*, 465 U.S. at 897, 104 S.Ct. at 1548. The fact that plaintiff's counsel are fine attorneys, and that it is commendable that they have represented the interests of a plaintiff who might not otherwise have access to the courts, does not justify charging an hourly rate far in excess of that which prevails in the local market. Reviewing all the circumstances of this case, the court finds that a reasonable hourly rate for Mr. Davis is $125 for out-of-court time and $150 for court time. As to Mr. Mullkoff, the court finds that given his relative inexperience, and considering comparable awards in other cases, *see, e.g., DPOA*, an hourly rate of $90.00 is reasonable.[13]

The court now addresses the plaintiff's request that his attorneys' fees be enhanced by a factor of two. The discretion of the trial court to enhance what has already been determined to be a reasonable rate is severely limited. *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). The *Blum* court held that factors

---

**11.** The affidavits submitted by both attorneys indicate that both have been involved in several other civil rights cases during the pendency of this case.

**12.** The Supreme Court has noted that the number of persons benefited should not be a significant factor in calculating fees under § 1988. *Blum*, 465 U.S. at 900, n. 16, 104 S.Ct. at 1549, n. 16.

**13.** *See*, also, *Orshan v. Macchiarola*, 629 F.Supp. 1014 (E.D.N.Y.1986), awarding $125.00/hour to lead counsel; *Lightfoot v. Walker*, 619 F.Supp. 1481 (S.D.Ill.1985), setting a rate of $115.00/hour for lead counsel, and $85.00/hour for the time of an associate; *Olga's Kitchen of Hayward, Inc. v. Papo*, 108 F.R.D. 695 (E.D. Mich.1985), setting a rate of $130.00/hour in a contract case.

such as the novelty and difficulty of the issues, the skill and reputation of the lawyers, and the amount of time expended should be reflected in the reasonable rate, and to base an upward adjustment on these factors would be to "double count" the fees. *Id.* at 898–901, 104 S.Ct. at 1548–1550. Such factors as "quality of representation" will justify an upward adjustment "only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was exceptional." *Id.* 465 U.S. at 899, 104 S.Ct. at 1549.

The plaintiff bases his request for upward adjustment not upon the "exceptional success" approach endorsed by *Blum,* but rather upon the risk of nonpayment in this case. *Blum* explicitly left open whether the risk of not being the prevailing party and hence not being entitled to a fee award would ever justify an upward fee adjustment. *Id.* at 901, n. 17, 104 S.Ct. at 1550, n. 17. Recently, the Court once again declined to decide this question though it did request reargument on the issue for next term. *Pennsylvania v. Delaware Valley Citizens' Council For Clean Air,* — U.S. ——, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). In a concurring opinion in *Blum,* Justice Brennan, joined by Justice Marshall, stated unequivocally that the risk of nonrecovery is a legitimate basis on which a district court may award an upward adjustment. *Id.,* 465 U.S. at 902–904, 104 S.Ct. at 1550–1551. Courts addressing this issue since *Blum* have split on whether a "contigency enhancer" is permissible in § 1988 fee petitions. *Institutionalized Juveniles v. Sec. of Pub. Wel.,* 758 F.2d 897 (3rd Cir.1985); *Wildman v. Lerner Stores Corp.,* 771 F.2d 605 (1st Cir.1985); *LaDuke v. Nelson,* 762 F.2d 1318 (9th Cir.1985); *Craik v. Minnesota State University Board,* 738 F.2d 348 (8th Cir.1984) all approved of such an upward adjustment, while *McKinnon v. City of Berwyn,* 750 F.2d 1383 (7th Cir.1984) and *Laffey v. Northwest Airlines, Inc.,* 746 F.2d 4 (D.C. Cir.1984), *cert. denied,* — U.S. ——, 105

S.Ct. 3488, 87 L.Ed.2d 622 (1985), have disapproved of the practice. The Sixth Circuit has not addressed this issue since *Blum,* but approved of taking the risk factor into account in earlier cases. *Louisville Black Police Officers' Organization v. City of Louisville,* 700 F.2d 268 (6th Cir.1983); *Northcross v. Board of Education of Memphis City Schools,* 611 F.2d 624 (6th Cir.1979), *cert. denied* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862.

Allowing the upward adjustment of attorneys' fees where the petitioner shows that there was a significant risk of nonpayment comports with direction taken by the majority of the courts who have considered the issue, and also with the intent of Congress as reflected in the legislative history of § 1988. Congress said that *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974) and *Stanford Daily v. Zurcher,* 64 F.R.D. 680 (N.D.Cal.1974), *aff'd.,* 550 F.2d 464 (9th Cir.1977), *rev'd on other grounds,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978), both cases which held that risk of nonpayment was a relevant factor, had correctly applied the fee-shifting statute. S.Rep. 1011, 94th Cong. 2d Sess. 5, *reprinted in* 1976 *U.S.Code Cong. & Ad.News* 5908 (1976). This approach is also consistent with Congress' intent that "private attorneys general" should play a significant role in enforcing the civil rights statutes, and that fee awards are an "essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain." *Id.* at 5910. This policy was recently reiterated by the Supreme Court:

> Congress enacted § 1988 specifically because it found that the private market for legal services failed to provide many victims of civil rights violations with effective access to the judicial process. These victims ordinarily cannot afford to purchase legal services at the rates set by the private market.

*Riverside v. Rivera,* — U.S. ——, 106 S.Ct. 2686, 2695, 91 L.Ed.2d 466 (1986). However, this policy must be tempered

with the competing concern that this fee-shifting statute not provide a windfall to attorneys.

Attorneys are directed to keep their fee petitions in line with what would be appropriate in normal civil practice. *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1939. The "lodestar figure," the product of reasonable hours times a reasonable rate, is strongly presumed to represent a reasonable fee. *Blum*, 465 U.S. at 898–901, 104 S.Ct. at 1548–1550. While recognizing the importance of making competent legal assistance available to § 1983 plaintiffs, the Supreme Court has also emphasized that fee shifting statutes are not designed to provide fees beyond those which would normally be available in private practice.

> These statutes were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client. Instead, the aim of such statutes was to enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws.

*Pennsylvania v. Delaware Valley Citizens' Council,* — U.S. ——, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986). It would be giving counsel a windfall not available in private practice to, as a matter of course, apply a "risk multiplier" in every civil rights case. The possibility of victory or defeat exists in every lawsuit. The average personal injury case is taken on a contingency fee basis, without the benefit of a multiplier to compensate for the possibility that there will be no fees if the outcome is a verdict of no cause of action.[14] Yet there is no evidence that injured plaintiffs in civil cases suffer from a lack of legal representation. Counsel have submitted neither a theoretical nor factual basis to support the argument that the uncertainty which exists in any lawsuit is alone

sufficient reason to augment an already reasonable rate, or that an unaugmented lodestar amount would discourage the bar from representing civil rights plaintiffs in most cases.

Most of the elements which pertain to risk of loss, hence nonpayment, are already factored into the lodestar figure. The *"Johnson* factors," employed by the court, *supra,* include the novelty and difficulty of the legal and factual issues of the case, the preclusion of other employment due to the acceptance of the case, whether the fee was fixed or contingent and whether the case was an "undesirable" or unpopular case. Just as quality of representation is presumably fully reflected in the fee award and normally cannot serve as an independent basis for increasing the basic fee award, *Delaware Valley,* 106 S.Ct. at 3098, so too is the risk of nonpayment already factored into the lodestar amount. However, applying the analysis of the Supreme Court in cases involving "quality multipliers," an upward adjustment based upon risk of nonpayment may be justified in the "rare case where the petitioner offers specific evidence" to show that the risk of nonpayment in a particular case was greater than one would reasonably expect an attorney to have to endure. *Delaware Valley,* at 3099.

Plaintiff's counsel have not demonstrated that this case presented an exceptional risk of nonpayment. If anything, the posture of this case was more favorable to the plaintiff than the average personal injury case. The defendant stipulated that he intentionally shot the plaintiff, and that the plaintiff was not involved in the original fight in the prison yard. All the eyewitnesses to the incident, including six prison guards, all testified that the plaintiff never engaged in any aggressive behavior. The defendant's colleagues also unanimously testified that the shooting was not warranted. There was uncontra-

---

**14.** The court also notes that fees are not always received as a matter of course by attorneys who bill their clients by the hour. Almost one-third of the respondents to the Michigan State Bar survey reported that over eight percent of their billed fees are not collected. 64 *Mich. Bar J.,* 1312 (1985).

dicted testimony that this was the first shooting of a prisoner at Jackson Prison in any of the witnesses' experience. The only significant factual disputes involved the defendant's uncorroborated testimony concerning the incident, and the extent of the plaintiff's damages. There were no novel or complex legal issues which posed a significant risk of loss in this case. The controlling law during the pendency of this case, from that promulgated by the Supreme Court to the regulations issued by the Michigan Department of Corrections, was clear as to the limits imposed upon prison officials as to the measures they are permitted to employ to control inmates.[15] The risk of nonpayment in this case was no greater than that which exists in any civil case, and was already factored into the court's calculation of the basic hourly rates. Accordingly, the hourly rate for each of the plaintiff's attorneys will be:

| | Rate |
|---|---|
| Mr. Davis: | |
| Non-Court Time | 125.00 |
| Court Time | 150.00 |
| | |
| Mr. Mullkoff | 90.00 |

The court must now consider the number of hours to be attributed to plaintiff's counsel for the work performed.

▇▇▇ The defendant objects to fees and costs incurred in the prosecution of a related lawsuit in state court. The state case was an appeal under the Michigan Administrative Procedures Act of a decision by the Michigan Department of Corrections Hearing Division (MDOC) which had found the plaintiff guilty of assaulting an inmate.

The plaintiff filed an action in state court to review the MDOC action, resulting in a dismissal of the misconduct finding for the reason that the plaintiff's due process rights had been violated. Plaintiff's counsel argues that they are entitled to the fees generated in this effort because it was necessary to the prosecution of the federal case.

The court must disallow claims for costs and fees incurred, in the state court action. Section 1988 authorizes an award of attorney's fees in "any action or proceeding" brought under § 1983. The Supreme Court has held that Section 1988 does not authorize reimbursement of fees and costs for time spent in state proceedings initiated pursuant to state law. *Webb v. Board of Educ. of Dyer County,* 471 U.S. 234, 105 S.Ct. 1923, 85 L.Ed.2d 233 (1985). The court held that "the time compensable under § 1988 is that 'reasonably expended *on the litigation.*'" *Webb,* 105 S.Ct. at 1928. The court does have the discretion to grant fees for legal work "... that was both useful and of a type ordinarily necessary" to secure the first result obtained from the litigation. *Id.,* 105 S.Ct. at 1929. In this case, the state proceeding was brought pursuant to the Michigan Administrative Procedures Act, and was not necessary to this § 1983 litigation.[16] The court finds that 18 hours billed by Mr. Mullkoff, 1.4 hours billed by Mr. Davis, and $141.44 in costs are attributable to the state proceeding, and must be disallowed.[17]

▇▇▇ The defendant objects to the amount claimed for travel, copying, post-

---

15. The Supreme Court case of *Whitley,* which modified the law in a manner favorable to defendants, was issued after the jury returned its verdict in this case. As the purpose of § 1988 is to provide an incentive for competent counsel to decide to represent average citizens, it would be speculative to adjust awards on the theory that the incentive must include the potential for changes in the law adverse to the petitioners' clients.

16. Nor was the state court action comparable to tangential proceedings necessary to the enforcement of a consent decree obtained in litigation in which fees are recoverable. *See, Pennsylva-*

*nia v. Delaware Valley Citizens' Council For Clean Air,* —— U.S. ——, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986).

17. The defendant also objects to 4 hours billed by Mr. Davis for time spent at the mediation tribunal. Defense counsel states that she does not recall Mr. Davis actually participating in the mediation process, but concedes that he did participate in a post-mediation hearing discussion of the mediation evaluation. The plaintiff did not respond to this objection. Accordingly, the court will deduct 3 hours from Mr. Davis' fee petition.

age, and general litigation expenses. The law is clear that a reasonable attorney fee includes "those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services." *Northcross v. Board of Ed. of Memphis City Schools,* 611 F.2d 624, 639 (6th Cir. 1979); *Ramos v. Lamm,* 713 F.2d 546 (10th Cir.1983). Thus reasonable copying, travel, and telephone expenses are recoverable under § 1988. These expenses are only allowed if such expenses are charged separately, and are not customarily absorbed as part of the law firm's overhead. *Ramos,* 713 F.2d at 559. In addition the expenses permitted under § 1988, costs such as docket fees, deposition expenses, witness expenses and court reporter fees may be recovered pursuant to 28 U.S.C. § 1920. *Northcross,* 611 F.2d at 624; *Ramos,* 713 F.2d at 560. Where the court denies requests for costs, specific reasons must be given by the court. *Northcross,* 611 F.2d at 639. However, the court is mindful of the Supreme Court's admonition that prevailing attorneys must exercise "billing judgment" and that expenses not properly billed to one's client ought not be billed to one's adversary. *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939.

Reviewing plaintiff's counsel's travel expenses and litigation expenses, the court finds the bulk of the request to be reasonable. Most of the costs, with one exception, are directly related to the prosecution of this case. Most of the travel expenses are also reasonable. They were incurred mostly by Mr. Mullkoff, whose office is in Ann Arbor, which is halfway between the prison at Jackson, and where the trial was held in Detroit. He also had to make some longer trips to other prison facilities in the state to interview prisoners who were transferred from Jackson during the pendency of this case. In *Ramos v. Lamm,* 713 F.2d 546 (9th Cir.1983), the court disallowed the travel expenses of out-of-town counsel from Washington, D.C. where the incident occurred in a Colorado prison and the trial was held in Denver. However, travel from Denver to the prison was held

to be properly allowed. Here, one of the attorneys' offices is located halfway between the site of the incident of the trial court, and the other is located only a few blocks from the courthouse. There is no issue of unreasonable travel expenses incurred by out-of-town counsel here.

The defendant objects to 17.6 hours spent by Mr. Mullkoff preparing an expert witness who did not testify. Expert witness fees in excess of the normal statutory fee for witnesses are not allowed under 28 U.S.C. § 1920. However, such expert fees have been awarded under § 1988 in civil rights cases where the expert's testimony was reasonable, necessary, and of assistance in determining the issues of the case. *Ramos, supra; Jones v. Diamond,* 636 F.2d 1364 (5th Cir.1981); *NAACP v. DPOA,* 620 F.Supp. 1173 (E.D.Mich.1985); *Greenspan v. Automobile Club of Michigan,* 536 F.Supp. 411 (E.D.Mich.1982). The plaintiff's expert never testified in this case, thus he provided no testimony which was necessary to the case or that was of assistance to the court. Thus any fees collected by this expert cannot be recovered by the plaintiff. However, the court finds that it was reasonable for Mr. Mullkoff to consult with a prison expert in this case. As one court has said, expert testimony is often a "vital ingredient in the proper presentation and decision" of a prison case. *Jones,* 636 F.2d at 1382, and an attorney would likely be derelict in his duty if he did not at least consult an expert at some point during the case. Further, the cases cited above only restricted the recovery of the expert's fee, not the time the attorney spent consulting with the expert. Reviewing the affidavits of counsel, the court finds that the plaintiff's expert was paid a fee of $450.00, which will be disallowed.

In its own review of counsel's affidavits, the court notes that over 36 hours is claimed for "conferences," almost all of it between plaintiffs' counsel. Almost one-third of Mr. Davis' out of court time was spent in consultation with Mr. Mullkoff. Mr. Mullkoff has billed many of the same

conference hours as Mr. Davis. The court recognizes that it is common practice in all areas of legal practice to assign two lawyers to a case, usually matching an experienced attorney with a more junior colleague whose hourly rate is correspondingly less. *See, e.g., Johnson v. Univ. Col. of Univ. of Ala. in Birmingham,* 706 F.2d 1205 (11th Cir.1983), *cert. denied,* 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684; *Veterans Ed. Project v. Secretary, Etc.,* 515 F.Supp. 993 (D.C.1981), *aff'd,* 679 F.2d 263 (D.C.1982). The theory is that the "junior" lawyer does the bulk of the work at the lower rate, under the supervision of his or her senior attorney, so that the higher rates are charged only for those tasks requiring the more experienced attorney's expertise. The goal of this arrangement, more moderate attorney's fees, is defeated if the senior attorney spends significant amounts of time consulting with junior counsel. The client loses the benefit of having a task performed by less expensive counsel, and must pay a double fee for hours where two lawyers are consulting.

■ The Supreme Court has said that applicants for § 1988 fees should exercise "billing judgment" with respect to hours worked. *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941. Trial courts are directed to exclude hours "not reasonably expended," and must consider whether a case is overstaffed. *Id.,* at 434, 103 S.Ct. at 1939. Counsel must keep their petitions in line with what would be appropriate in normal civil practice

> Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethi-

cally is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Copeland v. Marshall,* 205 U.S.App.D.C. 390, 401, 641 F.2d 880, 891 (1980) (en banc) (emphasis in original).

*Id.* The Sixth Circuit has held that in cases involving several attorneys, "hours may be cut for duplication, padding or frivolous claims." *Northcross,* 611 F.2d 636. *See, also, Henry v. First Nat. Bank of Clarksdale,* 603 F.Supp. 658 (N.D.Miss.1984); *Williams v. Tri-County Grocers,* Slip Op. No. 82–2208 (November 21, 1985), (cutting 18 hours of telephone conference time between two attorneys as duplicative). The court finds that billing a client over 36 hours for attorney conferences to be both excessive and duplicative.[18] Accordingly, the court will reduce the hours billed by plaintiff's counsel under the category of "conferences" by one-half, resulting in a subtraction of 9.4 hours from Mr. Davis' petition and 9.1 from Mr. Mullkoff's.[19]

Pursuant to the above findings, the court has calculated the following sums as reasonable fees and costs to be awarded in this case.

| | Hours | Rate | Total |
|---|---|---|---|
| Mr. Davis: | | | |
| Court Time: | 23.15[20] | 125.00 | 2,893.75 |
| Non-Court Time: | 49.3 | 150.00 | 7,395.00 |
| TOTAL | | | 10,288.75 |
| Mr. Mullkoff: | | | |
| All Time | 371.8 | 90.00 | 33,462.00 |
| TOTAL ATTORNEY FEES | | | 43,750.75 |
| COSTS | | | 4,221.33 |
| TOTAL FEE AND COST AWARD | | | 47,972.08 |

**18.** To the extent the forty mile distance between counsels' offices increased the time spent on conferences, the court finds that this factor should not be taken into account, absent some showing that it was necessary to have counsel from two cities represent the plaintiff.

**19.** In *Northcross,* the court approved the practice of arbitrarily deducting a small percentage of the total hours to eliminate duplication of

services. *Id.,* 611 F.2d at 636–637. While that is not the approach taken in this case, the court notes that its deduction of duplicative hours constitutes barely 4 percent of the hours claimed by plaintiff's counsel.

**20.** The 4.5 hours Mr. Davis spent in court waiting for the jury to return its verdict cannot be properly classified as "court time" justifying the higher hourly rate.

 The plaintiff's counsel requests post-judgment interest on the fee and cost award pursuant to 28 U.S.C. § 1961. Interest on such awards in civil rights cases is appropriate. *Spain v. Mountanos*, 690 F.2d 742 (9th Cir.1982); *Alexander v. National Farmers' Organization*, 614 F.Supp. 745 (D.Mo.1985); *Williamburg Fair Housing Committee v. Ross-Rodney Housing Corp.*, 599 F.Supp. 509 (S.D.N.Y. 1984); *Preston v. Thompson*, 565 F.Supp. 294 (N.D.Ill.1983). Claims for attorneys' fees and costs are unliquidated until finally determined by the court and a judgment entered. Therefore, interest will be applied to the total amount of $47,972.08 from the date of the judgment allowing this award. Pursuant to § 1961(a), the interest rate shall be the average accepted auction price for the last auction of fifty-two week United States Treasury bills prior to the date of the order.

To sum up, the defendant's motion for a new trial is denied because there was sufficient evidence to allow the jury to reasonably infer that the defendant unnecessarily and intentionally inflicted pain upon the plaintiff and that he did this in violation of clearly established rights set forth in the Eighth Amendment and prison regulations. Accordingly, Defendant's Motion for Judgment Notwithstanding the Verdict and for New Trial are denied. The plaintiff's petition for fees and costs is granted, with a total fee award of $43,750.75 and costs of $4,221.33 plus interest, to be paid by the defendant within thirty (30) days of this order.

IT IS SO ORDERED.