**P.J. THOMPSON, et al., Plaintiffs,**

**Phillip R. Pope, Plaintiff–Appellee,**

v.

**OFFICE AND PROFESSIONAL EMPLOYEES INTERNATIONAL UNION, AFL–CIO, Defendant–Appellant.**

No. 94–5399.

United States Court of Appeals, Sixth Circuit.

Argued May 16, 1995.

Decided Feb. 8, 1996.

Peter Alliman, Lee, Alliman & Carson, Madisonville, TN, Carol S. Nickle, Carol Nickle & Associates, Knoxville, TN, Arthur L. Fox (argued and briefed), Washington, DC, for Plaintiff–Appellee.

Joseph E. Finley, Baltimore, MD, Melvin S. Schwarzwald, Todd M. Smith, Schwarzwald & Brock, Cleveland, OH, Lucinda M. Finley (argued and briefed), SUNY at Buffalo School of Law, Buffalo, NY, for Defendant–Appellant.

Before: JONES and RYAN, Circuit Judges; MATIA, District Judge.*

RYAN, J., delivered the opinion of the court, in which JONES, J., joined. MATIA, D.J. (pp. 1510–12), delivered a separate opinion concurring in part and dissenting in part.

RYAN, Circuit Judge.

The defendant, Office and Professional Employees International Union (OPEIU), appeals the jury verdict for the plaintiff in this action under the Labor–Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 411(a)(1), (2) and (5), arising from the termination of the plaintiff's position as a business representative for the OPEIU following the imposition and lifting of a trusteeship. We are asked to determine: (1) whether Pope has standing to bring a claim under the LMRDA; (2) whether the district court

---

* The Honorable Paul R. Matia, United States District Judge for the Northern District of Ohio, sitting by designation.

erred in permitting a jury to decide issues surrounding the imposition and maintenance of the trusteeship; (3) whether the district court erred in admitting letters from the United States Department of Labor; (4) whether there was sufficient evidence for the jury to conclude that the trusteeship was maintained as a purposeful and deliberate attempt to suppress dissent within the local union; (5) whether the district court erred in directing a verdict for Pope on the issue of whether Pope's union membership rights were violated when he was issued a withdrawal card after he was fired; (6) whether there was sufficient evidence to support the jury's award of emotional distress damages; (7) whether there was sufficient evidence to support the jury's award of punitive damages; and (8) whether the district court erred in refusing to grant OPEIU's motion for a mistrial on the grounds that Pope spoke with the jury foreman. We conclude that the district court did not err and that there is sufficient evidence to support the jury verdict.

A detailed recitation of the facts is necessary for an adequate understanding of our decision.

## I.

After twenty eight years of working in the labor union movement in positions that required significant travel obligations, Phillip Pope joined Local 268 of the OPEIU in Knoxville, Tennessee, as a business representative. Pope was appointed, not elected, to the position. The position allowed Pope to spend more time at home with his new family. The OPEIU represents employees at companies such as the Tennessee Valley Authority (TVA) and Baptist Hospital.[1] His position as business representative is described in the job description as "that of [an] agent for the union in its various dealings with management and as advisor to the Local Union officers various matters concerning contract negotiations, training of job stewards, grievance processing, and organizational activities." The job description also provides that the business representative "should be" a dues-paying member of OPEIU Local 268." Pope's understanding was that this provision did not require him to join the local union. During his interview for the position, Tim Witt, the President of the Executive Board of Local 268 at the time, informed Pope that he should join the union but that he would not force him to become a member.

Soon after Pope began working for Local 268, he concluded that the Executive Board was, in several respects, acting in violation of the local's bylaws, the OPEIU constitution, and federal law. Pope learned, for example,

· that one person on the board held two positions in violation of the local and international unions' constitutions;

· that the board improperly increased membership dues in violation of Title I of the LMRDA, 29 U.S.C. § 411(a)(3);

· that the board did not sign checks with the proper number of signatures in violation of the local and international unions' constitutions;

· that the board was improperly scheduling elections and meetings for nominations;

· that the board improperly handpicked delegates to be sent to the OPEIU convention and was improperly using union funds for political purposes; and

· that telephone calls from members to the local office were always answered by an answering machine and that grievances were lost and not processed.

Pope brought these illegalities to the attention of the board and the members of the OPEIU leadership. As to the problems regarding the elections, Pat Allen, the Secretary–Treasurer of the Executive Board, responded that the board had been running the elections the same way for twenty years and that they did not need Pope telling them how to run their elections. When Pope informed Faye Orr of the OPEIU in June of 1989, Orr told Pope that the international union did not get involved in politics and suggested that he discuss the problems with the local board.

---

1. Pope claims that the OPEIU also represents employees at Martin Marietta. The OPEIU denies any involvement with Martin Marietta.

Nevertheless, Orr, in June 1989, wrote an internal OPEIU memorandum stating:

> To keep you further informed on the internal politics.
>
> .    .    .    .    .
>
> To make matters worse, gossip is out that Phillip [Pope] is trying to have Pat [Allen] ousted from the Executive Board and as Shop President. To keep the International cleared from all the suspicion, I am dealing almost exclusively in matters such as this with Pat or Tim Witt.

During this time, morale within Local 268 was at an all-time low mainly due to massive layoffs by the TVA. Pope, when asked, was more than willing to share his discoveries of the board's illegalities with members of the union. Support for Pope grew within the union and soon a slate of candidates was formed to run against the incumbent board in the December 1989 elections. Pope was the challengers' choice to run for president of the board. Pope testified that the slate stood for "making our union responsive to the will of the members which meant probably kicking out most, if not all, of the old officers, bringing our constitution and bylaws up to date like should have been done, running our union the way it should be run, [and] being more responsive to the members' problems [and] needs."

According to Pope, in April or May of 1989, he had a conversation with Orr in which Orr stated that "she understood that Jim Cash and [he] were planning on running for local union office or president of our local union." Pope responded that at that time he was "still testing the waters." Orr allegedly responded, "let me tell you. There is no way in hell OPEIU will tolerate that. . . ." Orr also allegedly had a similar conversation with Jim Cash, the business agent of the OPEIU Local 18 in Alabama. According to Cash, Orr telephoned him and said, "what's this I hear about you and Phillip [Pope] running for President of the locals." Cash responded, "well, what's wrong with that, Faye, we're both members." Orr then answered, "you know that the OPEIU is not going to allow that."

In August 1989, two months before nominations for the December elections were to take place, the incumbent board proposed a change to the local's constitution. The proposed change would read: "All full-time paid staff of the local and all representatives of the international union shall be associate members of this local with the privileges of participating in this local's meetings but not voting." Because Pope was a full-time paid staff member, he interpreted this provision as designed to prevent him from running for office.

In an October 16, 1989 meeting, Allen moved to fire Pope. Allen withdrew the motion for lack of support and resigned from office. Maxine Keeble, another member of the board, moved to force Pope to stop "politicking" or to resign. A member of the reform slate, Jo Davenport, was voted in to replace Allen. The membership then voted and passed a proposal that Pope run for president. The meeting ended abruptly, without adjournment, when members of the local simply walked out.

This October meeting was described by members of the board as chaotic and out of control. Cletus Walles described the meeting as follows:

> [I]t wasn't a meeting, it was a joke, it was a boisterous, unruly people, they were talking out of turn, it really wasn't a meeting. You couldn't call it a meeting because we weren't going by any rules and regulations of a meeting. Various things were said, a lot of emotions were being shown at that meeting; all I was trying to do is tell people to sit down and be quiet . . . so the executive board could get on with their session and I said I'm not conducting any new business at this meeting, period, and I said that from the start, but as far as being a meeting, there was a lot of disruption.

Keeble testified that Pope was "tearing the union to pieces" and creating schisms on the board. Witt testified that ever since Pope arrived at Local 268, the board was divided between his supporters and opposers. He was very concerned that the division was affecting the operation of the local union. Pat Sing, another board member, described

Pope as being in complete control of some members of the board.

After the meeting, members of the board discussed what had occurred. They learned that Orr was in town and arranged to meet with her at a Hyatt Hotel in Knoxville. Orr advised them that they could ask the international union to place the local under trusteeship. The board members then wrote a letter, dated October 18, 1989, to the President of the OPEIU, John Kelly, requesting that he impose a "voluntary trusteeship" on Local 268. The letter explained that "certain individuals . . . are disrupting the operation" of the local union. The letter described the October 16 meeting and then stated, "We feel that the problems are of such magnitude and urgency that for the good of our local we request immediate intervention. . . ."

On October 25, 1989, Kelly imposed an emergency trusteeship on Local 268 and assumed total control over the local through an appointed trustee, Donald Wright. The letter imposing the trusteeship explained:

> This action was taken for several reasons. Firstly, half of the members of the executive board of the Local requested it. Secondly, there was a schism in Local 268 that threatened the best interests of our members of that local. Thirdly, the executive board of the Local had become unstable. This instability resulted in the executive board being divided into factions. I received reports of these factions conducting executive board meetings on their own and attempting to set policy for the Local. Therefore, to provide greater stability and protect the best interest of the local members, the Local was placed in trusteeship.

A hearing was not conducted prior to imposing the trusteeship, but the letter informed the local president that a hearing would be held to determine whether the trusteeship was properly instituted and whether it should be discontinued.

According to Pope, in mid-November after the trusteeship was imposed, he asked trustee Wright what it would take to end the trusteeship. Wright allegedly answered, "Phillip, I believe if you would stand up and summons the members or tell the members that you are not going to run for president, I

think we can get this trusteeship over in a hurry."

During the trusteeship, Pope expressed his opinion that the trusteeship was improper and illegal. When he expressed this opinion to Wright, Wright in response told him that

> he ought to stay out of the . . . politics . . . of his opinion about the trusteeship while he was on work time during the day, and I don't care what he does on his time, that's his business, but as business representative, working under my direction, I directed him not to voice his feeling about an illegality or impropriety of the trusteeship because it had been imposed and I didn't want him to do that.

Shortly before the trusteeship hearing, Wright heard that Pope was telling the members that the hearing was going to be a "kangaroo court" because, in Pope's opinion, the outcome was a foregone conclusion. Wright told Pope

> that really makes the international union look bad, impu[gns] the integrity of it, of the international president, of the process, before anybody's gotten here, before anything's happened you're already putting this in our members' minds further dividing our own membership . . . I don't want you doing that . . . on your work time, as business representative. . . .

According to Wright, Pope responded that he was going to tell the members despite his request.

On December 5, 1989, the day of the hearing, Wright gave Pope a formal written reprimand dated December 4, 1989. President Kelly assured Wright that it was not a problem to give Pope a reprimand immediately before the hearing, but Pope viewed the reprimand as an attempt to prevent him from testifying because Wright gave it to him before the hearing, knowing that Pope was going to testify. The reprimand informed Pope that his activities since the imposition of the trusteeship "have continued to be a source of divisiveness within the membership of Local 268." The letter cited three specific examples of alleged misconduct: (1) Pope used his position as business representative "to persuade the membership that the trust-

eeship is illegal" thereby "escalat[ing] the schism in the membership"; (2) Pope's "efforts to encourage some other candidate from another Organization within the Salary Panel to run against the current Chairperson, Faye Orr from OPEIU. This could have caused OPEIU to lose an important and influential position in bargaining with TVA which would have been detrimental to Local 268 and other OPEIU members who work for TVA"; and (3) Pope told members that the hearing would be a "Kangaroo Court" thereby "impugn[ing] the integrity of the International Union, the International President and the Hearing officer." The letter then concluded with:

> These examples, along with the previous problems which helped to cause the problems leading to the trusteeship must stop immediately. Further occurrences of this type of activities will lead to disciplinary action. I expect your efforts to be devoted to serving the needs of Local 268 members, and not to continue to divide them.

The hearing was conducted before, L.J. Sheridan, the OPEIU Vice–President. Sheridan heard various persons testify in favor of and against the trusteeship. Pope and many members of the local believed that the hearing was conducted unfairly. They testified that Sheridan permitted the supporters to testify much longer than the opposers and was significantly more suspicious of the opposers. Wright and Orr testified in favor of the trusteeship. Prior to issuing his formal report, Sheridan sent Wright a copy of the report with a memo. The memo read: "Enclosed *rough* draft of report—need your comments & feel free to add/delete—*please.* Any negative or smart ass comments about typing will be considered contempt of 'de judge'—and dealt with severely." (Emphasis in original.) The final report concluded that the imposition of the trusteeship was proper.

After the hearing, Wright allegedly told Pope that "it would be best for you to move on." He also told him "you have a good reputation in the labor movement . . . and you ought to resign now," and "if you sue us you would never get another job in the labor movement . . . you've got a chance to resign, I haven't expelled you yet." Wright fired

Pope on February 8, 1990. Wright told Pope that his termination was due to "incompatibility with the Local." Shortly after his termination, Pope was issued a union membership withdrawal card without notice or an opportunity to be heard; Pope did not request the card. Pope understood this action to mean that he was ineligible to run in any upcoming elections. Pope's job was offered to Ronald Hutson. Hutson refused the job when he received a phone call threatening his children, a call which the OPEIU alleges was made by Pope. On the same day that he received the call and refused the position, Hutson was assaulted in a parking garage.

In a trusteeship report to President Kelly written on February 10, 1990, Wright recommended that "we not hold nominations immediately, but wait a month or so to let things calm down some while the slate of 'non-Pope' candidates are [sic] gaining followers. It might also look better as far as Pope's situation. . . ." While the trusteeship was still imposed, the OPEIU proposed a merger of Local 268 with Local 119 in Chattanooga, Tennessee. The first vote approved the merger proposal. However, Pope supporters complained that the union's unilateral merger proposal was improper under the union's international constitution. Due to the members' challenges and the OPEIU's concern of low voter turnout, the OPEIU allowed a second vote on the merger proposal; the proposal failed.

President Kelly recommended at a January 1991 OPEIU meeting that the trusteeship be lifted. Elections were scheduled to take place in April 1991. Davenport, a Pope supporter, ran as the leader of the reform ticket; the OPEIU did not allow Pope to run for office because he was not a member of the union. In preparation for this election, various officers of the OPEIU used the TVA's internal mail system to circulate campaign materials. The reform slate was denied the right to use the TVA internal mail system. Wright, the trustee, after speaking with Orr and Thomas Addington of TVA labor relations, informed Pope that it was improper to use the TVA mail system for personal material. The contract between the TVA and the Salary Policy Employee Panel

provides, in pertinent part: "Mail between TVA and the representatives of recognized unions and mail between representatives or members of recognized unions may be transmitted through TVA interoffice mail."

The Davenport slate was elected and the trusteeship was lifted on April 30, 1991, 18 months and 5 days after it was imposed. The new board reinstated Pope as business representative.

Before the trusteeship was lifted, Pope and several other plaintiffs filed suit in the United States District Court for the Eastern District of Tennessee under the LMRDA, 29 U.S.C. § 401 *et seq.*, alleging that the trusteeship was imposed for an improper purpose. Plaintiffs sought monetary, injunctive, and declaratory relief. Pope alleged that his termination and expulsion from the union violated his rights under Title I of the LMRDA. The district court dismissed the damage claims of all the plaintiffs except for Pope ruling that he was the only plaintiff that could claim a measurable monetary loss. After the elections took place in April 1991, the district court held that the plaintiffs' claims for injunctive and declaratory relief as to the imposition of the trusteeship and the merger were moot and therefore dismissed the claims. Thus, Pope remained as the only plaintiff in the case.

Prior to trial before a magistrate judge, the defendant moved to exclude all evidence regarding the validity of the trusteeship on the following grounds: (1) the plaintiffs' claims for injunctive and declaratory relief as to the imposition of the trusteeship and the merger were dismissed; (2) Pope should not be able to put on evidence regarding the purpose of the trusteeship because the validity of the trusteeship was ruled moot by the district court; and (3) the validity of a trusteeship must be decided by a judge, not a jury. The magistrate judge denied the motion ruling that, because Pope alleged that his Title I rights were violated when the OPEIU imposed the trusteeship to quell democracy, the appropriateness of the trusteeship is still at issue.

The case was heard by a jury over fourteen days. During the trial, the magistrate judge ruled that letters written by the Department of Labor to the OPEIU regarding the trusteeship were inadmissible under Rule 803(8)(C) of the Federal Rules of Evidence. The magistrate judge later reversed his ruling, *sua sponte*, in a memorandum to counsel and allowed the letters to be entered into evidence. Also during the trial, the court granted a judgment as a matter of law in favor of Pope on the issue of whether Pope's due process rights under 29 U.S.C. § 411(a)(5) to be given written charges, time to prepare his defense, and a full and fair hearing before being removed involuntarily from union membership, were violated.

The jury found in favor of Pope, and awarded him $100,000 in compensatory damages and $1 in damages for expulsion from union membership under section 411(a)(5). The jury also assessed $100,000 in punitive damages against the OPEIU. In a special verdict form, the jury found as follows: (1) Pope was involuntarily removed from union membership in retaliation for the exercise of his right guaranteed by 29 U.S.C. § 411(a)(1) to participate equally with the other union members in union affairs and elections; (2) Pope was involuntarily removed from union membership in retaliation for the exercise of his free speech and assembly rights guaranteed by 29 U.S.C. § 411(a)(2); (3) Pope did not prove by clear and convincing evidence that the trusteeship was *imposed* for the purpose of interfering with the plaintiff's free speech and assembly rights, or his right, with other union members, to participate equally in union affairs and elections; (4) Pope proved by clear and convincing evidence that the trusteeship was *maintained* for the purpose of interfering with the plaintiff's free speech and assembly rights, or his right, with other members, to participate equally in union affairs and elections; and (5) Pope proved by clear and convincing evidence that his termination as a union employee was part of a scheme by the defendant to suppress the right of free speech and assembly and the right to participate equally in union elections and affairs within the union.

The OPEIU filed a motion for judgment notwithstanding the verdict, now called a judgment as matter of law, and/or a new trial and to set aside the punitive damages award.

The court denied the motion. The OPEIU appeals and urges this court to reverse.

## II.

■ The OPEIU's first assignment of error alleges that Pope impermissibly recovered under the LMRDA as Pope is not a person whom the LMRDA is designed to protect. The OPEIU bases its argument on two grounds. First, the OPEIU argues that Pope was not a "legal" member of Local 268 because Pope's job description "required" Pope to be a member of the union and an employer may not impose membership as a condition of employment unless certain stringent requirements are met that are not met in this case.

Because the district court addressed this claim in its ruling on the OPEIU's motion for a new trial and judgment notwithstanding the verdict, this court must review the judgment using the same standard used by the district court. " '[T]he evidence must be viewed in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor.' ... If the evidence 'points so strongly in favor of the movant that reasonable minds could not come to a different conclusion, then the motion should be granted.' " *Marsh v. Arn*, 937 F.2d 1056, 1060 (6th Cir.1991) (quoting *Ratliff v. Wellington Exempted Village Sch. Bd. of Educ.*, 820 F.2d 792, 795 (6th Cir.1987)).

■ To support its claim that Local 268 impermissibly forced Pope to become a member of the union, the OPEIU cites to *NLRB v. Michigan Conference of Teamsters Welfare Fund*, 13 F.3d 911 (6th Cir.1993). *Michigan Conference* set forth the rule that an employer violates sections 8(a)(1), (2) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a), when it conditions employment on membership in a union which was never designated by a majority of employees as their chosen representative. *Id.* at 916. A union-employer may condition employment on membership in such a union only if the employer can demonstrate that (1) the "membership impacts job performance"; and (2) the employer "affirmatively notifies employees that the requisite membership does not impact their right to choose another union to bargain on their behalf." *Id.* at 917.

The OPEIU's argument fails for two reasons. First, Pope's job description simply states that the business representative "should be" a dues-paying member of the OPEIU Local 268. Pope's understanding was that this provision did not require him to join the local union. His understanding was confirmed during his interview for the position when Witt informed Pope that he should join the union but that he would not force him to become a member.

Second, the *Michigan Conference* rule is inapplicable to the case at hand. The *Michigan Conference* rule applies when an employer forces an employee to join a union which has not been elected by a majority of the employees. This is simply not the case at hand. Local 268 and the OPEIU were the majority's chosen representative. Thus, Pope was not forced into joining a union that was not chosen as the representative.

As its second ground, the OPEIU claims that the LMRDA is designed to protect only "rank and file" union members, not union officers and employees. The OPEIU argues that Pope was an appointed employee of Local 268 and therefore not permitted to bring an LMRDA suit.

The Supreme Court in *Finnegan v. Leu*, 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982), discussed standing to sue under Title I of the LMRDA. The plaintiffs in *Finnegan* were discharged from their positions as paid business agents after the incumbent president, for whom they campaigned, lost his bid for reelection. *Id.* at 433–34, 102 S.Ct. at 1869–70. The plaintiffs claimed that being dismissed for supporting a losing candidate constituted "discipline" for the exercise of their right of free speech under the LMRDA. *Id.* at 437, 102 S.Ct. at 1871. The Court rejected their claim by distinguishing between the plaintiffs' rights as members of the union and their rights to employment in appointed positions. The Court concluded that the latter was not protected by the LMRDA. *Id.* at 439, 102 S.Ct. at 1872. The Court reasoned that the purpose of the LMRDA was "to ensure that unions would

be democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections." *Id.* at 441, 102 S.Ct. at 1873. The Court added that "the ability of an elected union president to select his own administrators is an integral part of ensuring a union administration's responsiveness to the mandate of the union election." *Id.*

In *Sheet Metal Workers' International Association v. Lynn,* 488 U.S. 347, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989), the Supreme Court addressed whether an elected business agent is protected by the LMRDA. In *Lynn,* an international union imposed a trusteeship on one of its locals to alleviate a financial crisis. The trustee proposed a dues increase during a special meeting with the members. Lynn, an elected business representative, outspokenly opposed the dues increase. *Id.* at 350, 109 S.Ct. at 642.

The proposal was defeated. Five days later, the trustee informed Lynn that he was being terminated due to his "outspoken opposition to the dues increase." *Id.* Lynn filed suit against the union under Title I of the LMRDA. The Court distinguished the case before it from *Finnegan.* The Court explained that in *Finnegan,* the goal of the LMRDA "to ensure that unions [are] democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections" was furthered when the newly elected president terminated the staff of the previous incumbent board. *Id.* at 354, 109 S.Ct. at 644 (quoting *Finnegan,* 456 U.S. at 441, 102 S.Ct. at 1873). The Court recognized that the termination in *Finnegan* "had some chilling effect on the [business agents'] free speech" but that the effect was "outweighed by the need to vindicate the democratic choice made by the union electorate." *Id.* at 355, 109 S.Ct. at 644. The Court noted that the consequences that ensue when an elected official is removed are much different. First, when an elected official is removed, "the union members are denied the representative of their choice." *Id.* Second, the Court believed that the chilling effect is much more pronounced when an elected official is discharged. The Court stated that

[n]ot only is the fired official likely to be chilled in the exercise of his own free speech rights, but so are the members who voted for him.... Seeing Lynn removed from his post just five days after he led the fight to defeat yet another dues increase proposal, other members of the Local may well have concluded that one challenged the union's hierarchy, if at all, at one's peril. This is precisely what Congress sought to prevent when it passed the LMRDA.

*Id.* (footnote omitted). The Court therefore held that retaliatory action taken against an elected official is actionable under the LMRDA. *Id.*

Subsequent to the Supreme Court's decision in *Finnegan,* this circuit faced a case similar to this one, but with one major distinction that makes a great deal of difference. In *Cehaich v. International, UAW,* 710 F.2d 234 (6th Cir.1983), Cehaich, an employee of General Motors, was appointed to a position as benefits representative for a local unit of the international union. Cehaich was also a member of the union. After his appointment, the national union negotiated a new collective bargaining agreement with General Motors. *Id.* at 236. The agreement was presented at a meeting with union members. During the meeting, Cehaich expressed opposition to the agreement and distributed a leaflet opposing the agreement. Immediately after the meeting, Cehaich was fired from his position as benefits representative, *id., but remained a member of the union.* Cehaich filed suit under the LMRDA. The court held that Cehaich was not entitled to protection under the LMRDA because he "was not disciplined in any manner which affected his right to fully enjoy the rights and privileges of union membership." *Id.* at 240. The court noted that Cehaich was both a member of the union and an officer and that these were distinct roles that did not necessarily affect each other. *Id.* at 238. The court further noted that his status as a member of the union did not change after he was terminated from his appointed position. He was not fined, suspended, expelled or disciplined. *Id.*

The Tenth Circuit in *Gesink v. International Association of Machinists and Aerospace Workers*, 831 F.2d 214 (10th Cir.1987), held that a plaintiff is protected by the LMRDA when his membership rights in a union are affected by a union's actions. *Id.* at 217. The Tenth Circuit defines membership rights as including the right to run for office. *Id.*

■ Pope's situation does not fall neatly within either *Finnegan* or *Lynn.* However, it can be reconciled with both cases. The Supreme Court has articulated that the purpose of the LMRDA is "to ensure that unions would be democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections." *Finnegan*, 456 U.S. at 441, 102 S.Ct. at 1873. This is a theme that runs through both *Finnegan* and *Lynn* and dictates the outcome of both cases. In *Finnegan*, the appointed officials of an ousted board were not protected by the LMRDA, because the union members elected a new board. In *Lynn*, the elected officials were protected because they had been elected by the union members. The purpose of ensuring democracy is furthered by allowing Pope a cause of action under the LMRDA. Pope was appointed business representative by an elected local executive board. That board was not ousted as in *Finnegan.* Moreover, unlike *Cehaich*, Pope was expelled from union membership immediately after his termination from his position as business representative. Thus, Pope's case is clearly distinguishable from *Cehaich.* Pope is entitled to protection under the LMRDA because he was disciplined in a manner which affected his right to fully enjoy the rights and privileges of union membership.

### III.

In addition to the standing argument, the OPEIU makes two additional arguments as to why the jury should not have heard this case. First, the OPEIU contends that it is well-settled law that once a trusteeship has been lifted, questions regarding the validity of the purposes for which it was imposed or maintained are moot. The OPEIU argues that the district court's distinction between deciding the validity of a trusteeship and deciding whether a trusteeship was imposed or maintained for an improper purpose is a meaningless distinction. The OPEIU believes that deciding whether a trusteeship was imposed for an improper purpose is determining its validity. Second, the OPEIU contends that the propriety of the reasons for imposing and maintaining a trusteeship is a question for the court, not the jury. We review this question of law *de novo.*

Title III of the LMRDA, 29 U.S.C. § 461 *et seq.*, governs the imposition of trusteeships. Section 462 instructs labor organizations as to when the imposition of a trusteeship is appropriate. That section reads:

> Trusteeships shall be established and administered by a labor organization over a subordinate body only in accordance with the constitution and bylaws of the organization which has assumed trusteeship over the subordinate body and for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization.

29 U.S.C. § 462.

■ Title III attaches a presumption of validity for a period of eighteen months to trusteeships that have been imposed in conformity with the procedural requirements of the labor organization's constitution and bylaws and authorized or ratified after a fair hearing. The trusteeship is not subject to attack during those eighteen months except upon clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under section 462. After eighteen months, the trusteeship is presumed invalid unless the labor organization can show by clear and convincing evidence that the continuation of the trusteeship is necessary for a purpose allowable under section 462. 29 U.S.C. § 464(c).

Although not expressed in the statute, some circuits have held that once a trusteeship has been lifted, questions regarding the validity of the purposes for which the trusteeship was imposed or maintained are moot.

See, e.g., *Laborers' Int'l Union v. National Post Office Mail Handlers,* 880 F.2d 1388, 1393 (D.C.Cir.1989); *Air Line Stewards & Stewardesses Ass'n, Local 550 v. Transport Workers Union,* 334 F.2d 805, 808 (7th Cir. 1964), *cert. denied,* 379 U.S. 972, 85 S.Ct. 648, 13 L.Ed.2d 563 (1965).

Title III of the LMRDA is designed to protect a subordinate union as a whole, whereas Title I, often called the "Member's Bill of Rights," is designed to protect the individual rights of the members of a union. Section 411 provides, in part:

### (a)(1) Equal rights

Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

### (2) Freedom of speech and assembly

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings....

29 U.S.C. § 411(a)(1), (a)(2).

The Supreme Court has not expressly decided whether evidence surrounding the imposition and maintenance of a trusteeship may be submitted to a jury in a Title I case. However, in *Lynn,* 488 U.S. 347, 109 S.Ct. 639, the Court found "nothing in the language of the LMRDA or its legislative history to suggest that Congress intended Title I rights to fall by the wayside whenever a trusteeship is imposed." *Id.* at 356, 109 S.Ct. at 645. Given this finding, the Court con-

cluded that "a trustee's authority under Title III ordinarily should be construed in a manner consistent with the protections provided in Title I." *Id.* at 357, 109 S.Ct. at 646. In addition, in discussing a member's Title I right to vote on dues increases, the court stated that "this critical Title I right does not vanish with the imposition of a trusteeship." *Id.* at 358, 109 S.Ct. at 646.

As least one district court has held that the lifting of a trusteeship does not preclude a union member from seeking damages against a local and international union under Title III of the LMRDA for imposing a trusteeship in order to prevent him from assuming an elected position as business representative. *Pruitt v. United Bhd. of Carpenters and Joiners of Am.,* 659 F.Supp. 1511, 1520 n. 11 (N.D.Ga.1987), *vacated on other grounds,* 893 F.2d 1216 (11th Cir.1990).

The OPEIU's position is untenable. If evidence regarding the imposition or maintenance of a trusteeship after it has been lifted were inadmissible, national and international unions could impose trusteeships with impunity, including as a means to suppress Title I rights, and remain immune from legal scrutiny as long as they lifted the trusteeship before the plaintiff has his day in court. The Supreme Court has expressed its view that Title I individual rights are not suspended during a trusteeship. If the OPEIU's position were to prevail, Title III would trump Title I rights.

Furthermore, the OPEIU's argument carries the mootness doctrine to an illogical end. Courts holding that questions regarding the validity of trusteeships ordinarily are moot once the trusteeship is lifted are merely following the case or controversy requirement of Article III of the United States Constitution. When a plaintiff sues for injunctive and/or declaratory relief once a trusteeship has been lifted, obviously there is no longer any relief to be had. However, in this instance, there is no risk of issuing an advisory opinion. The question of the propriety of the trusteeship is not moot because it has direct bearing on whether Pope's Title I rights were violated. Pope is not simply seeking to lift a trusteeship or declare a trusteeship invalid after it has been lifted.

The OPEIU's argument that the propriety of imposing and maintaining the trusteeship

is a question that may not be submitted to a jury is also mistaken. This is not an equitable action seeking solely a determination whether a trusteeship has been validly imposed. Rather, this is an action at law to recover damages for the suppression of Title I rights as a result of the imposition of a trusteeship.

Thus, it was not error for the district court to rule that evidence regarding the imposition and maintenance of the trusteeship could be submitted to the jury.

## IV.

During the trial, Pope sought to introduce various letters written by officials of the Department of Labor. The magistrate judge initially ruled that the documents were inadmissible. However, he *sua sponte* reversed his ruling in a written memorandum to counsel. In the memorandum, he ruled that the letters were admissible under Rule 803(8)(C), the public records and reports exception to the hearsay rule.

The documents at issue are plaintiff's exhibits 197, 198, 199, and 200. Exhibit 197 is a letter to President John Kelly from Richard Hunsucker, the Director of the Office of Elections, Trusteeships and International Union Audits of the Department of Labor. The letter informs Kelly that the Department of Labor conducted an investigation into the Local 268 trusteeship and then states:

> In that no hearing was conducted within 30 days per Article XV, Section 2f, the validity of the trusteeship imposition may be in doubt, ab initio.
>
> However, without consideration for any such procedural flaws, the trusteeship may be invalid for another reason. The International Union has failed to demonstrate to [the Office of Labor–Management Standards] that the trusteeship was imposed for a reason which is valid under the statute. Our investigation did not determine that the local had been guilty of failing to follow democratic procedures in any manner contemplated by Title III. The other cited reason for imposition, to correct instability and factionalism, is not a valid purpose under Section 302 of the LMRDA.

> ... Even if the trusteeship imposition is presumed to be procedurally valid, there appears to be clear and convincing evidence that it was imposed and is being continued for purposes other than those allowable under Section 302.
>
> ....
>
> A final determination based on the investigation and any information you submit will be made in the near future.

Exhibit 198 is another letter written by Hunsucker to President Kelly. This letter was written to Kelly after the general counsel of the OPEIU, Joseph Finley, wrote a memorandum to the Department of Labor justifying the imposition of the trusteeship. In this letter, Hunsucker writes:

> [Finley] has made several strong arguments in attempting to justify the trusteeship's imposition.
>
> Mr. Finley's arguments notwithstanding, a troublesome situation still remains. Most of the individuals within Local 268 who were prominently involved in the so-called "schism" are no longer active or even members of Local 268.... [N]o trusteeship can continue indefinitely simply because all of the members of the subordinate body are not of like mind; a virtual impossibility in a democratic organization. Without conceding that the imposition of the trusteeship was ever valid, the Department's position is that its continuation at this time is certainly for no legitimate purpose. In fact, the continuation serves to deprive the membership of Local 268 of the officer election to which it was entitled in December 1989.
>
> A final decision concerning action by the Department of Labor to require the termination of the trusteeship over Local 268 has not yet been made.

The OPEIU does not discuss exhibits 199 and 200; Pope describes exhibits 199 and 200 as "merely concern[ing] the timing and circumstances under which OPEIU was to conduct Local elections and lift its trusteeship." There are two letters written by Hunsucker to Kelly in the record that fit this description. The first acknowledges receipt of a letter written by Kelly informing Hunsucker that he planned to lift the trusteeship. Hun-

sucker writes that the Department of Labor will hold in abeyance plans for litigation if four conditions are met which are set out in the letter. The second letter acknowledges receipt of a letter written by Kelly outlining the steps that the OPEIU was planning to take to lift the trusteeship. Hunsucker then writes that, in his opinion, Pope would be eligible to run for office in the upcoming elections despite his termination.

■ The OPEIU argues that the district court committed prejudicial error when it admitted the letters from the Department of Labor regarding the validity of the Local 268 trusteeship. The OPEIU contends that these letters do not satisfy Federal Rule of Evidence 803(8)(C), the public records and reports exception to the hearsay rule, in that the letters do not satisfy the trustworthiness requirement of 803(8)(C).

Rule 803(8)(C) allows certain public records and reports to be admitted into evidence as an exception to the hearsay rule. Rule 803(8)(C) provides, in pertinent part:

> (8) **Public records and reports.** Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions and proceedings ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

■ Such reports are not rendered inadmissible because they contain facts, conclusions, or evaluations. *Bank of Lexington v. Vining–Sparks Sec., Inc.*, 959 F.2d 606, 616 (6th Cir.1992). "[T]he party opposing the admission of the report[s] must prove that the report is not trustworthy." *Id.* To determine whether a report is trustworthy, a court should consider four factors as set out by the Advisory Committee: "(1) the timeliness of the investigation, (2) the special skill or experience of the investigators, (3) whether the agency held a hearing, and (4) possible motivational problems." *Id.* No one factor is dispositive. *Id.* at 617.

The admissibility of the first two letters cannot be challenged on appeal because the OPEIU moved to admit those letters into evidence. The second two letters should not have been admitted as they were not "[r]ecords, reports, statements, or data compilations ... setting forth ... factual findings resulting from an investigation made pursuant to authority granted by law." However, we cannot say that any substantial rights of the OPEIU were affected. Thus, we regard the error as harmless. *See* Fed.R.Evid. 103.

## V.

■ The OPEIU also challenges the verdict as not supported by sufficient evidence. The OPEIU argues that Pope did not prove by clear and convincing evidence that he was discharged as the result of a purposeful and deliberate attempt to suppress dissent. It gives three reasons: (1) the evidence was overwhelming that Pope was fired for legitimate reasons, namely his disruptive and insubordinate conduct; (2) free speech, assembly, and dissent flourished throughout the trusteeship, including after Pope was discharged, and there was never a single act by the OPEIU to attempt to suppress anyone's right to speak; and (3) there was no evidence other than Pope's discharge from which a reasonable jury could have found a plan to suppress dissent.

■ This court reviews a motion for judgment as a matter of law using the same standard used by the district court. " '[T]he evidence must be viewed in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor.' ... If the evidence 'points so strongly in favor of the movant that reasonable minds could not come to a different conclusion, then the motion should be granted.' " *Marsh*, 937 F.2d at 1060 (quoting *Ratliff*, 820 F.2d at 795).

■ To establish a violation of Title I rights, the plaintiff must prove the following elements: (1) the plaintiff's conduct was an exercise of free speech as defined and protected by Title I; (2) the defendant took actions against the plaintiff in substantial part because of this exercise of his Title I rights; and (3) the plaintiff was damaged and suffered an injury as a proximate result of the defendant's actions. *Black v. Ryder/P.I.E. Nationwide, Inc.*, 970 F.2d 1461, 1469 (6th Cir.1992).

■ If the plaintiff proves these three elements, he has established his *prima facie* case. The defendant may overcome the *prima facie* case by proving the following affirmative defense by a preponderance of the evidence: "It [is] lawful for a union to discipline a member for a violation of a union's reasonable rules. A union may reasonably regulate speech and assembly which is part of the pattern of conduct designed to destroy the union and interfere with the performance of its legal obligations." *Id.*

We conclude that the jury verdict was supported by sufficient evidence. A rational trier of fact could find that the trusteeship was maintained to suppress protected Title I speech. The evidence strongly suggests that the trusteeship was maintained to prevent Pope and his supporters from democratically gaining control of the executive board. Some of the most damaging evidence is as follows: (1) in a trusteeship report dated February 10, 1990 to President Kelly, Wright advised Kelly that he was going to interview to fill the business agent position and wrote, "[i]f it goes well, I will make him an offer with a one year contract to influence Pope to move on"; (2) in the same report, Wright suggested that "we not hold nominations immediately, but wait a month or so to let things calm down some while the slate of 'non-Pope' candidates are [sic] gaining followers"; (3) despite warnings from the Department of Labor that the trusteeship was likely improper, the OPEIU maintained the trusteeship; (4) in mid-November after the trusteeship was imposed, Pope asked trustee Wright what it would take to end the trusteeship. Wright allegedly answered, "Phillip, I believe if you would stand up and summons the members or tell the members that you are not going to run for president, I think we can get this trusteeship over in a hurry"; and (5) the OPEIU would not let Pope run as a candidate in the 1991 elections. In light of this evidence, the district court did not err in refusing to grant a judgment as a matter of law after the jury rendered its verdict.

## VI.

■ The OPEIU also challenges the district court's directed verdict for Pope on the issue of whether Pope's rights were violated when he was issued a withdrawal card after he was terminated. The OPEIU cites to the OPEIU constitution and the local constitution which provide that unless a member is working for an employer who bargains with a local or the international, or is an employee or officer of any local of the international of its affiliates, that member shall be issued a withdrawal card and will then no longer be a member until that individual resumes work within the jurisdiction of any local or resumes employment or office with any local or the international. Under this provision, the OPEIU argues, it was proper to issue Pope a withdrawal card. It argues that Pope was not entitled to notice and a hearing because 29 U.S.C. § 411(a)(5) provides that notice and a hearing is required only when a member is "fined, suspended, expelled, or otherwise disciplined." The OPEIU argues that because Pope was merely terminated, he was not entitled to notice and a hearing.

29 U.S.C. § 411(a)(5) governs the procedures with which a labor organization must comply before taking action against a member. Section 411(a)(5) provides:

> **(5) Safeguards against improper disciplinary action**
>
> No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

Regarding withdrawal cards, Article XXI, section 1(b) of the OPEIU constitution states, in part:

> Whenever any member is not in the employment of any employer who bargains with any Local Union or the International Union, the Local Union shall issue a withdrawal card to such member. . . . This subsection shall not apply to any member who holds office in, or is employed by, the International Union, any of its Local Unions or Councils. . . .

A straightforward application of section 411(a)(5) supports the district court's grant-

ing of a judgment as a matter of law on this issue. As a member of the union, Pope was entitled to notice and a hearing before being expelled from the union. There can be no doubt that the issuance of a withdrawal card is the equivalent of expulsion from the union. The OPEIU contends that, under its constitution, an employee who is no longer employed with an employer who bargains with any local union or the international union, must automatically receive a withdrawal card and is therefore not entitled to the protections of section 411(a)(5). However, that same constitutional provision states that the provision does not apply to any member who holds office in, or is employed by, the international union or one of its locals.

## VII.

■ The Sixth assignment of error challenges the jury's award of emotional distress damages. The OPEIU argues that the district court erred in denying its motion for judgment notwithstanding the verdict regarding the jury's award of emotional distress damages. The OPEIU contends that a significant part of the compensatory damages awarded to Pope must have been for emotional distress damages because Pope offered evidence of only $20,900 in lost wages and benefits and $12,000 in other economic costs. The OPEIU claims that there was insufficient evidence of physical manifestations of distress.

■ Generally, this circuit allows damages for emotional distress to be awarded "upon a showing of intimidation, marital problems, weight loss, loss of sleep, shock, or humiliation." *Holmes v. Donovan*, 984 F.2d 732, 739 (6th Cir.1993).

Evidence of Pope's emotional distress was elicited through the testimony of his wife. Bingham Pope testified that beginning in December 1989, two months after the trusteeship was imposed, Phillip Pope was not sleeping well. She testified that he would often wake up in the middle of the night. She also remembered that her husband "was on pins and needles" and nervous when he went to work. In January 1990, she stated that her husband visited the doctor for chest pains, however, she noted that Pope had a

history of high cholesterol. She further testified that after her husband was fired, he became depressed and gained weight. She stated that Pope became obsessed with trying to clear his name. Bingham Pope also recalled an evening when her husband came home from a Central Labor Council meeting and told her that the Council told him that he could not sit for the meeting because he was no longer an OPEIU representative. She said that he was trembling and there were tears in his eyes when he told her the story. She thought he had been publicly embarrassed and humiliated. She said that she had only seen him cry two or three times before that evening and that normally he was not a very emotional person.

This evidence meets the general standard that this court applies, as the evidence showed that Pope suffered from a loss of sleep, weight gain, and embarrassment. The OPEIU claims that this court should consider only such injuries as Pope may have suffered after his termination. But since we have determined that the jury properly considered the issues regarding the imposition and maintenance of the trusteeship, it was proper for the jurors to consider the injuries Pope may have suffered during that time as well.

## VIII.

The OPEIU also challenges the punitive damages award. The union claims that the punitive damages award must be set aside because there was no evidence that Pope's discharge was carried out maliciously, recklessly, or with wanton indifference.

The LMRDA does not expressly authorize or preclude punitive damage awards. Many circuits do allow punitive damage awards for violations of the LMRDA, but only upon some showing of malice or ill will. For example, the Eighth Circuit permits punitive damages where the "union or its officials maliciously violate a plaintiff's rights." *Schmid v. United Bhd. of Carpenters & Joiners of Am.*, 827 F.2d 384, 386 (8th Cir. 1987), *cert. denied*, 484 U.S. 1071, 108 S.Ct. 1041, 98 L.Ed.2d 1004 (1988). The District of Columbia Circuit has stated that punitive damages "should be imposed only in the most egregious cases, in which the conduct of the

union or its officers was malicious—motivated by ill will or a purpose to harm the plaintiff's interests." *Quinn v. DiGiulian,* 739 F.2d 637, 651 (D.C.Cir.1984). The Ninth Circuit allows punitive damages upon a showing that the defendant acted with malice or reckless or wanton indifference to the plaintiff's rights. *Bise v. International Bhd. of Elec. Workers,* 618 F.2d 1299, 1305 (9th Cir. 1979), *cert. denied,* 449 U.S. 904, 101 S.Ct. 279, 66 L.Ed.2d 136 (1980).

■ In light of the evidence presented in this case, a reasonable trier of fact could have found that the OPEIU acted with malice or with reckless or wanton indifference to Pope's rights. As discussed, *supra,* there were several pieces of evidence presented which suggest that the OPEIU wanted to prevent Pope and his supporters from gaining control of the local board at any expense without regard to Pope's Title I rights. We think the district court did not err in refusing to set aside the punitive damages award.

### IX.

■ Lastly, the OPEIU challenges the failure of the district court to grant a mistrial based on contacts between Pope and the jury foreman. During a lunch break on one of the days of the trial, the foreman of the jury was walking towards the front of a restaurant to pay his bill when Pope was in line to be seated. Pope asked the juror, "how is the food?" The juror responded, "tolerable." Those were the only words exchanged between the juror and Pope. The OPEIU moved for a mistrial based on this incident. The court asked if the OPEIU wanted the court to call in the juror to be questioned about the incident. The OPEIU declined. Thereafter, the court denied the motion ruling that it would be too drastic a solution and then told Pope that speaking to a juror "was not a good thing to do." The court reminded the parties that he already "instructed th[e] jury that anything that occurs outside of this courtroom is to be disregarded by them with regard to the merits of the case" and offered to give the jury another cautionary instruction if requested by the parties.

■ We review the district court's decision not to grant a mistrial for alleged unauthorized contact with jurors for abuse of

discretion. *United States v. Pennell,* 737 F.2d 521, 533 (6th Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985). This court has held that an "abuse of discretion exists when the reviewing court is firmly convinced that a mistake has been made." *United States v. Winston,* 37 F.3d 235, 239 (6th Cir.1994) (citing *United States v. Chambers,* 944 F.2d 1253, 1263 (6th Cir. 1991), *cert. denied,* 502 U.S. 1112, 112 S.Ct. 1217, 117 L.Ed.2d 455 (1992), *and cert. denied,* 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992)).

■ The OPEIU argues that the district court erred in denying the motion for a mistrial because the mere appearance of impropriety compels a new trial. The OPEIU urges this court to follow the language in *Budoff v. Holiday Inns, Inc.,* 732 F.2d 1523 (6th Cir.1984), which instructs courts that there are certain cases where the mere appearance of impropriety compels a new trial as a prophylactic rather than a remedial measure. However, later cases have limited *Budoff*'s general language to the specific facts in *Budoff. See United States v. Marshall,* 767 F.2d 293, 295 (6th Cir.1985). If a case does not fall within the narrow confines of the *Budoff* rule, a party, in order to receive a new trial, must prove that actual prejudice resulted from the contact with the juror. *Budoff,* 732 F.2d at 1525–26.

In *Budoff,* plaintiff counsel's daughter, who was a paralegal for her father and present in the courtroom throughout the trial, contacted the son, a friend of hers, of one of the jurors and discussed the merits of the case. *Id.* at 1525. *Budoff* held that "a new trial should be ordered when contact with a juror is purposely made by counsel or his employee." *Id.* at 1527.

In *United States v. Mitchell,* 590 F.2d 816 (6th Cir.1979), the defendant claimed that the district court should have granted a mistrial where a juror during a trial recess was preparing to enter an elevator in which one of the defendants was riding. The defendant asked the juror if she was afraid to ride the elevator with him. The juror simply refrained from riding the same elevator with the defendant. *Id.* at 816. The court conducted an *in camera* hearing which was not recorded. The defendant challenged both the failure to grant a mistrial and the failure

to record the hearing. *Id.* at 817. In its holding, this court specifically addressed only the failure to make a record of the hearing and held that it was not error. The court then affirmed the judgment of the district court thereby implicitly approving of the court's decision that the contact was insufficient to grant a mistrial. *Id.*

The juror contact in this case was not sufficient grounds to grant a mistrial. The contact was not nearly as egregious as in *Budoff,* where a purposeful call was placed to a juror to discuss the merits of the case. Here, the contact was brief, incidental, and did not involve the merits of the case. The facts of this case are like those in *Mitchell* where the court implicitly held such insignificant contact to be insufficient grounds to grant a mistrial.

Moreover, it is highly unlikely that this brief contact with one member of the jury influenced the jury's verdict. Thus, the OPEIU has not proved that the conduct was prejudicial. In addition, the district court offered to take several cautionary measures of which the OPEIU refused to take advantage. The OPEIU did not want the juror questioned and did not request a cautionary instruction to the jury. The district court, therefore, did not abuse its discretion in refusing to grant a mistrial.

## X.

Accordingly, the judgment of the district court is **AFFIRMED.**

MATIA, District Judge, concurring in part and dissenting in part.

Although I agree with the majority's disposition of six of the eight issues raised in this appeal, I respectfully dissent as to two: (1) whether Pope has standing to bring a claim under the LMRDA for his firing, and (2) whether the district court erred in directing a verdict for Pope on the issue of whether his union membership rights were violated when he was issued a withdrawal card after he was fired as business representative.

With respect to these issues, it is important to understand his status within the local union. Local 268 of the OPEIU represents employees at companies such as the Tennes-

see Valley Authority and Baptiste Hospital. Although Pope was not a member of either Local 268 or the OPEIU and had no prior association with either, he was employed by Local 268 as a business representative. There is no dispute that the evidence shows that Pope was not and had never been employed by any employer covered by a bargaining agreement with Local 268. Pope subsequently became a member of Local 268 solely by reason of his status as an employee of Local 268.

The United States Supreme Court has held that removal from *appointive* union employment is not actionable under either section 609 or Title I of the LMRDA, but that an *elected* union official does have a right of action under the LMRDA. *Finnegan v. Leu,* 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982); *Sheet Metal Workers' Intern. Ass'n v. Lynn,* 488 U.S. 347, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989). *See also Tucker v. Bieber,* 900 F.2d 973 (6th Cir.1990), and *Cehaich v. International Union, United Auto., Aerospace and Agr. Implement Workers of America,* 710 F.2d 234 (6th Cir.1983). The majority opinion notes that the *Cehaich* case is "similar to this one, but with one major distinction that makes a great deal of difference." (Majority Opinion, p. 1502) That distinction is that Cehaich remained a member of the union. In this case, Pope did not. That fact has apparently convinced the majority that Pope's case is clearly distinguishable from *Cehaich,* and that Pope is entitled to protection under the LMRDA because he was disciplined in a manner which affected his right to fully enjoy the rights and privileges of union membership. I disagree. I would find that Pope has no standing to bring a claim under the LMRDA.

There are two distinct events which occurred in this case: (1) termination of Pope as appointed business representative, and (2) issuance to Pope of a membership withdrawal card. The first event—termination—is not actionable under *Finnegan, supra,* and its progeny. Nor is the second event actionable, because Pope was not "disciplined" within the meaning of section 411(a)(5) of the LMRDA when he was issued a withdrawal card.

Section 411(a)(5), 29 U.S.C., which governs the procedures with which a labor organiza-

tion must comply before taking action against a member, provides:

> No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

The term "member" is defined as follows in 29 U.S.C. § 402(*o*):

> "Member" or "member in good standing," when used in reference to a labor organization, includes any person *who has fulfilled the requirements for membership in such organization, and* who neither has voluntarily withdrawn from membership nor has been expelled or suspended from membership after appropriate proceedings consistent with lawful provisions of the constitution and bylaws of such organization. (emphasis added).

Regarding withdrawal cards, Article XXI, section 1(b) of the OPEIU constitution and Article XX, section 3 of the Local 268 constitution contain the following provision:

> Whenever any member is not in the employment of any employer who bargains with any Local Union or the International Union, the Local Union shall issue a withdrawal card to such member....

A similar withdrawal provision was upheld by this court in *Taylor v. Great Lakes Seamen's Union, Local 5000, United Steelworkers of America*, 701 F.2d 590 (6th Cir.1983), wherein the court said that "we see nothing 'unreasonable' about a rule which, in effect, guarantees that internal union affairs will be governed by those whose interests are most at stake—workers presently employed in the ... industry." *Id.* at 592.

The majority opinion holds that "[a]s a member of the union, Pope was entitled to notice and a hearing before being expelled from the union. There can be no doubt that the issuance of a withdrawal card is the equivalent of expulsion from the union." (Majority Opinion, pp. 1508–09) I cannot agree. Pope was not "disciplined" within the

meaning of section 411(a)(5) when he was issued a withdrawal card pursuant to the union constitution upon losing his sole claim to eligibility for membership. *See Department of Labor v. Aluminum, Brick and Glass Workers Intern. Union, Local 200*, 941 F.2d 1172, 1177 (11th Cir.1991) (union officials did not "discipline" members within the meaning of section 411(a)(5) by excluding them from election voting for failure to satisfy one of the preconditions for member-in-good-standing status). Section 402(*o*) allows a union to establish requirements for membership which members must *continue* to fulfill at all times. Since Pope did not, he lost his eligibility for membership, and the issuance to him of a withdrawal card did not constitute "discipline."

The majority opinion claims that the withdrawal card provision quoted above does not apply to any member who is employed by the union, based upon the following clause: "This subsection shall not apply to any member who holds office in, or is employed by, the International Union, any of its Local Unions or Councils...." That appears to be an incorrect construction. I believe a correct interpretation of that clause requires the addition of the words "while such member holds office or is so employed." That this is the appropriate interpretation of this clause becomes apparent when the entire subsection is read:

> b.  Whenever any member is not in the employment of any employer who bargains with any Local Union or the International Union, the Local Union shall issue a withdrawal card to such member, subject to the provisions of this section. This subsection shall not apply to any member who holds office in, or is employed by, the International Union, any of its Local Unions or Councils, any federation or council of labor organizations with whom the International Union or any of its Local Unions is affiliated, or any central body with whom any Local Union is affiliated, or to any member entitled to benefits under any health, welfare, or pension plan whose continued coverage is conditioned upon union membership, or to any member who, in the regular course of employment has become retired, or to any unemployed member

seeking dispatch to a union job through the facilities of the Local Union.

Clearly, the withdrawal card provision is not punitive or disciplinary. It is a reasonable membership control mechanism to guarantee "that internal union affairs will be governed by those whose interests are most at stake—workers presently employed in the ... industry." *Taylor*, 701 F.2d at 592.

Since Pope was not "disciplined" within the meaning of section 411(a)(5) when he was issued a withdrawal card upon losing his sole claim to eligibility for membership, he has no legal ground for relief. Therefore, it was error for the district court to direct a verdict for Pope.

For all of the foregoing reasons, I must dissent from the majority's resolution of two of the eight issues.